**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

| | |
|---|---|
| JUSTIN GEORGE, ARIENNE PATZELT, MELISSA ZUBER, and TSU HAN POH-GRACIA, as representatives of a class of similarly situated persons, and on behalf of the Garnet Health Medical Center 403(b) Retirement Savings Plan and Garnet Health Medical Center - Catskills 403(b) Retirement Savings Plan, | Case No. 7:24-cv-6422 |
| Plaintiffs, | |
| v. | **FIRST AMENDED COMPLAINT** |
| GARNET HEALTH MEDICAL CENTER, | **CLASS ACTION** |
| Defendant. | |

## NATURE OF THE ACTION

1.     Plaintiffs Justin George, Arienne Patzelt, Melissa Zuber, and Tsu Han Poh-Gracia, as representatives of the Class described herein, and on behalf of the Garnet Health Medical Center 403(b) Retirement Savings Plan (the "Garnet RSP") and the Garnet Health Medical Center - Catskills 403(b) Retirement Savings Plan (the "Catskills RSP") (together, the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Garnet Health Medical Center ("Garnet" or "Defendant").

2.     Garnet breached its fiduciary duties under ERISA, 29 U.S.C. § 1104(a)(1), by failing to monitor (i) the Plan's stable value investment option; (ii) other proprietary investments furnished by the Plan's recordkeeper; and (iii) the cost of the Plan's administrative services.

3.     Garnet's failure to remove and replace these high-cost, underperforming investment options and to control the administrative fees charged to the Plan resulted in substantial losses to the Plan recoverable under ERISA, 29 U.S.C. § 1109.

4.     Plaintiffs bring this action on behalf of the Plan pursuant to 29 U.S.C. § 1132 to recover the losses resulting from Garnet's ERISA violations and to compel Garnet to implement prudent processes to prevent further losses to the Plan.

## INTRODUCTION

5.     Employers that manage workplace retirement savings plans governed by ERISA act in a fiduciary capacity. 29 U.S.C. § 1102(a)(1). Such fiduciaries must act with the "care, skill, prudence, and diligence" appropriate to this task. 29 U.S.C. § 1104(a)(1)(B). The standard of care, skill, prudence, and diligence required to manage an ERISA plan is often described as "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).

6.     Garnet failed to act with the care, skill, prudence, and diligence required of Garnet as an ERISA fiduciary. In 2010, Garnet purchased a bundled package of products and services for the Plan on the advice of a broker, but has not to this day implemented a prudent process for monitoring them. Garnet's failure since 2010 to monitor this bundled, broker-sold package of products and services constitutes a violation of its fiduciary duties under ERISA, 29 U.S.C. § 1104(a)(1).

7.     Had Garnet prudently evaluated the Plan's package of products and services by comparing them to other products and services readily available in the marketplace, it would have discovered that the Plan's investment returns were too low and its fees too high. Garnet has managed the Plan for the benefit of service providers first and participants only second.

8.     The Plan has during the statutory period to date suffered more than $12 million in losses from the high fees Garnet failed to monitor and from Garnet's poor investment choices. These losses continue both to accrue and to compound as a result of Garnet's continuing failure to implement a prudent process for replacing deficient

investments and for controlling costs, in a further violation by Garnet of its fiduciary duties under ERISA, 29 U.S.C. § 1104(a)(1) that continues to this day.

9.    The Plan's stable value contract—the Plan's single largest investment—has consistently provided returns well below prevailing market rates throughout the statutory period up to the present day.[1] The Plan is both relatively large and heavily reliant on stable value in general.[2] More than a quarter of the Plan's $273 million in assets is invested in a single stable value product. Nonetheless, the Plan's stable value product is an entry-level product that the Plan's recordkeeper, Principal Life Insurance Company ("Principal"), markets primarily to smaller, less sophisticated retirement plans[3] with less than $1 million in assets, most of which have less relative exposure to stable value products than Garnet. The returns from Garnet's entry-level product have not kept pace with the market. Indeed, Principal's stable value product's crediting rates—the stable value equivalent of a return, similar to interest on a bond fund—have fallen off a cliff relative to the crediting rates of other stable value products since the Plan subscribed to the Principal product back in 2010. Peer plans that, like Garnet, have tens of millions of dollars to invest in stable value products are faring far better in the marketplace in other products. They earn substantially

---

[1] ERISA claims are subject to a six-year statute of repose. 29 U.S.C. § 1113(1). A failure to monitor investments during the six-year period is actionable notwithstanding the date of initial investment. *Tibble v. Edison*, 575 U.S. 523, 528 (2015) ("*Tibble I*"). References to the "statutory period" mean the period that begins on the date that is six years prior to the date that this action was filed.

[2] This type of stable value product purports to guarantee the principal amount invested and a fixed rate of return—known as a crediting rate—subject to periodic adjustment.

[3] Due to economies of scale, smaller plans simply cannot easily afford the same level of advice as larger plans.

higher crediting rates for the equivalent level of risk. Under these circumstances, Garnet had to and still must test the market by placing the Plan's stable value contract out for bid. This Garnet has not done. Participants have lost and continue to lose substantial earnings because Garnet has tolerated and continues to tolerate below-market crediting rates.

10.     In addition to the underperforming stable value contract, the package of products and services Principal sold Garnet also included a series of high-fee Principal index funds. Many retirement plans invest in "index" funds that seek to mirror the performance of broad market indices. There are clear market leading investment managers that have been tracking indices reliably and at low cost for decades. Principal is not one of them—its index funds cost 2-5 times more than competitors for no additional benefit and exhibit persistent underperformance on top of the excessive fees. The reason that the Plan invests in Principal index funds is that Principal sold them to Garnet in 2010 and Garnet never replaced them with lower cost, better performing funds readily available from any one of the leading investment managers.

11.     Garnet also failed to monitor the Plan's "actively managed" Principal mutual funds. Actively managed funds seek to outperform certain broad market segments identified by the fund's investment manager. Any number of such funds are available from leading investment managers, whose funds are sold on the basis of merit. But Principal is not such a leading investment manager. As in the case of index funds, Principal's actively managed funds were selected, not on the basis of merit,

but because they were sold to Garnet as part of the bundled Principal package. The Principal funds have not delivered the outperformance sought and have underperformed their self-selected benchmarks. Had Garnet implemented a prudent process to monitor these funds, they would have long since been replaced with funds from industry leading providers. These funds remain in the Plan due to Garnet's neglect causing participants to forgo the competitive investment returns earned by the funds typically selected by fiduciaries of peer plans.

12.    In addition to poor returns from proprietary Principal investments, the Plan pays too much for administrative services. Fees paid for administrative services to Principal and to the Plan's broker are charged in two ways, neither of which were monitored by Garnet.

13.    The Plan's investments provide revenue credits and revenue sharing to cover Plan administration. Fiduciaries are required to track revenue credits and revenue sharing to ensure that their plan does not overpay. The value of revenue credits and revenue sharing available to the Plan ballooned in recent years, greatly exceeding the value of the services provided, but Garnet failed to capture the resulting savings or shop the marketplace for competitive pricing.

14.    Principal charges participants additional fees to withdraw funds from their accounts. Other vendors serving plans in the relevant marketplace do not charge extra fees for participants to access their funds, yet Garnet has acquiesced in these extra fees without question.

15.    For these reasons, Garnet has violated and continues to violate its fiduciary duties to the Plan under ERISA, 29 U.S.C. § 1104(a)(1). Plaintiffs seek on behalf of the Plan and participants recovery of the more than $12 million in losses to date resulting from Garnet's imprudence; recovery of such additional losses as may accrue and compound through trial; and injunctive relief sufficient to correct the deficiencies in Garnet's fiduciary process, as necessary to protect the Plan and the interests of participants in their retirement savings going forward.

## JURISDICTION AND VENUE

16.    Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy violations of ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

17.    This case presents a federal question and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §1132(e)(1)(F).

18.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the subject Plan is administered, where the breaches of fiduciary duty occurred, and where Garnet may be found.

## THE PLAN AND PARTIES

### THE PLAN

19.    Prior to 2021, the Plan was two plans—the Garnet RSP and the Catskills RSP.[4] The Garnet RSP and Catskills RSP were jointly administered by Garnet, and each plan had the same package of investments and services providers. The Garnet RSP and Catskills RSP merged in 2021, leaving the Garnet RSP as the surviving plan. References to the Plan herein refer to the plans as merged or as jointly administered, as context requires. References to Plan financial data herein is on a consolidated basis.

20.    The Plan is a "defined contribution plan" as defined by ERISA, 29 U.S.C. § 1002(34). The purpose of the Plan is to provide retirement benefits to eligible Garnet employees through the deferral of pre-tax wages and the investment the resulting contributions in a menu of investment options selected and, ostensibly, monitored by Garnet.

21.    The Plan is tax-qualified under 26 U.S.C. § 403(b) and commonly referred to as a "403(b) plan." Plans that operate under section 403(b)'s beneficial tax scheme are administered by certain qualifying non-profits, including universities and hospitals such as Garnet.

22.    In defined contribution plans such as the Plan, each employee has an individual account in the plan. The benefits ultimately paid to the employee are a

---

[4] The Garnet RSP was formerly known as the Orange Regional Medical Center 403(b) Retirement Savings Plan. The Catskills RSP was formerly known as the Catskill Regional Medical Center 403(b) Retirement Savings Plan.

function of the amount the employee and employer contributes to the plan and the performance of the investments net of fees.

23.     Participants are limited to the investments selected by the Plan's fiduciaries and cannot choose alternative investments outside the Plan's investment menu, even when the Plan's investments are inferior, and the alternatives are better investments. Participants are also subject to all fees and costs that the fiduciaries determine to pass on to participants.

24.     At year-end 2018, the Plan had around $178 million in assets and 2,668 participants with account balances (between the Garnet RSP and Catskills RSP combined—*see* Paragraph 19, *supra*). As of the Plan's most recent report, at year-end 2023, the Plan had $273 million in assets and 3,478 participants with account balances.

**PLAINTIFFS**

*All Plaintiffs*

25.     Plaintiffs are all natural persons who worked for Garnet. Plaintiffs all had account balances in the Plan during the statutory period. Three continue to hold account balances in the Plan.

26.     Plaintiffs all invested in one or more high fee, underperforming Principal products during the statutory period, as well as other funds that provide revenue credits and revenue sharing.

27.     Plaintiffs were not and are not able invest in prudent alternatives because the Plan does not offer them. Nor have Plaintiffs been able to claim available

administrative fee savings because only Garnet can request repricing or bids from other vendors on behalf of the Plan.

28.    Plaintiffs' account balances are lower, or their account distributions were lower, because Garnet failed to monitor and replace underperforming investments, failed to monitor the Plan's administrative fees and expenses, or failed to monitor revenue credits and revenue sharing available to the Plan.

29.    For example, the periodic earnings credited to the portion of Plaintiffs' accounts invested in the Principal stable value option during the statutory period were lower than the earnings that would have been credited had Garnet replaced the Principal stable value option with a prudent alternative, such as those identified in Paragraphs 72–80, *infra*. Likewise, the investment returns net of fees of Plaintiffs' accounts invested in Principal index funds during the statutory period were lower than they would have been had Garnet replaced the Principal index funds with prudent alternatives, such as those identified in Paragraphs 85–89, *infra*. During the periods in which Plaintiffs' accounts were invested in Principal's actively managed funds, the Principal funds underperformed relative to prudent alternatives such as those identified in Paragraphs 101–07, *infra*.

30.    Based on Plaintiffs' investments and account balances and the rates of revenue credits and revenue sharing available to the Plan during the statutory period, it is reasonable to infer that Plaintiffs paid excessive amounts from their accounts towards the cost of Plan administration. For example, Plaintiff Justin George's account generated around $160 in revenue sharing payments to Principal in

2021 to cover administrative costs (around 0.17% of his account value). As described in Paragraphs 125–31, *infra*, the total charge for equivalent administrative services should have been no more than around $69 to $73 (or around 0.09% or less). Plaintiff George was not credited back the difference, which Principal retained as excess fees. Had Garnet implemented a prudent process for monitoring the Plan's arrangements for payment of administrative costs and negotiated effectively on behalf of the Plan, Plaintiffs would have received more credits back to their individual accounts or paid lower fees in the first instance.

31.    Several Plaintiffs also were charged withdrawal fees during the statutory period. These fees were excessive, as described in Paragraph 137, *infra*, and their accounts balances were improperly reduced. The remaining Plaintiffs who still have accounts in the Plan will be subject to the same excessive withdrawal fees when they take distributions from their accounts.

*Justin George*

32.    Plaintiff Justin George currently has an account balance in the Plan and has maintained an account balance in the Plan throughout the statutory period. His account has during the statutory period been invested in underperforming Principal index funds, underperforming Principal actively managed funds, and other revenue credit and revenue sharing funds. He also paid an excessive withdrawal fee to receive a partial distribution from his account in 2022.

*Arienne Patzelt*

33.    Plaintiff Arienne Patzelt had an account in the Plan from the start of
the statutory period until she withdrew her account. Her account was during the
statutory period invested in the underperforming Principal stable value product,
underperforming Principal index funds, underperforming Principal actively managed
funds, and other revenue credit and revenue sharing funds.

*Melissa Zuber*

34.    Plaintiff Melissa Zuber has a current account balance in the Plan and
maintained a balance in the Plan throughout the statutory period. Her account was
during the statutory period invested in the underperforming Principal stable value
product, underperforming Principal actively managed funds, and other revenue
credit and revenue sharing funds.

*Tsu Han Poh-Gracia*

35.    Plaintiff Tsu Han ("Will") Poh-Gracia has a current account balance in
the Plan and maintained an account balance in the Plan since 2022. His account was
during the statutory period invested in the underperforming Principal stable value
product, underperforming Principal index funds, underperforming Principal actively
managed funds, and other revenue credit and revenue sharing funds.

## DEFENDANT

36.    Garnet is designated on the Plan's Department of Labor Form 5500
filings as the "administrator" of the Plan within the meaning of 29 U.S.C.
§ 1002(16)(A). In this capacity, Garnet exercises discretionary authority and control
over the administration of the Plan and the management and disposition of the Plan's

assets. Additionally, the Summary Plan Description Garnet distributed to the Plan's participants states that Garnet itself decides what investments are offered to Plan participants and that Garnet has the authority to remove and replace Plan investments. Thus, Garnet is a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A)(i) and (iii).

## ERISA'S FIDUCIARY DUTIES

37.     ERISA imposes strict fiduciary duties upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan …
>
> (A)   for the exclusive purpose of
>
>> (i)     providing benefits to participants and their beneficiaries; and
>>
>> (ii)    defraying reasonable expenses of administering the plan;
>
> (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims[.]

These duties are "the highest known to the law." *Bierwirth*, 680 F.2d at 272 n.8.

38.     ERISA fiduciary duties build on the common law of trusts. "Rather than explicitly enumerating *all* of the … duties of fiduciaries [in ERISA], Congress invoked the common law of trusts to define the general scope of their … responsibility." *Chesemore v. Fenkell*, 829 F.3d 803, 811 (7th Cir. 2016) (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985)).

39.     "If there is…a 'hallmark' of a fiduciary activity identified in the statute, it is prudence." *Sweda v. Univ. of Penn.*, 923 F. 3d 320, 333 (3d Cir. 2019). This is not

a lay person standard, but instead "requires expertise in a variety of areas[.]" Dep't of Labor, *Meeting Your Fiduciary Responsibilities* (Sept. 2021).[5]

40.    Fiduciaries have a "duty to exercise prudence in selecting investments" as well as a "continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble I*, 575 U.S. at 529.

41.    Attention to costs is vital. "[C]ost-conscious management is fundamental to prudence in the investment function' and should be applied 'not only in making investments but also in monitoring and reviewing investments." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) ("*Tibble II*") (quoting Restatement § 90); *see also* Restatement (Third) of Trusts ch. 17, intro. note (2007) ("The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles.").

42.    The emphasis on monitoring in the prudent investor rule recognizes that an investor's buying power, as well as the marketplace of available alternatives, will change. *See id.* (finding that the "availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs" requires a strong duty to monitor); *Tibble II*, 843 F.3d at 1198 (holding that a fiduciary "cannot ignore the power the trust wields to obtain favorable investment products").

---

[5] *Available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

43.    Fiduciaries must also be wary of the conflicts of interest among their service providers and advisors. *See* Restatement (Third) of Trusts § 80 cmt. b. (noting that a fiduciary "can properly take the information or suggestions [of advisors] into account but then . . . must exercise independent, prudent, and impartial fiduciary judgment"). A fiduciary must not allow conflicted providers to steer them to inferior products and services. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590 (8th Cir. 2009) (holding that it would violate ERISA if a fiduciary "fail[ed] to consider" a service provider's selfish interest in promoting certain products); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1071 (N.D. Cal. 2017) (holding that it would violate ERISA if a fiduciary failed to scrutinize "product-steering practices to influence [a service provider's] customers to invest in its own proprietary funds.").

44.    In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on process. *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356–58 (4th Cir. 2014) (holding that prudence turns on whether the fiduciary "employed the appropriate methods to investigate the merits" and "engaged in a reasoned decision-making process").

45.    Each dollar wasted is one less dollar in participants' accounts. These lost returns compound over time. The United States Department of Labor estimates that over the course of a career, earning 1% less in net returns per year will reduce a participant's savings at retirement by 28%.[6] This metric is meaningful in this case

---

[6] *See* Department of Labor, *A Look at 401(k) Plan Fees*, at 2 (Sept. 2019), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

because the Plan's losses caused by Garnet's breaches of fiduciary duty were in the 1% per year range over the statutory period.

## FACTUAL ALLEGATIONS
## CONCERNING DEFENDANT'S BREACHES OF FIDUCIARY DUTY

### I.    Garnet Engages Principal through a Broker.

46.    In around 2010, Garnet engaged a broker[7] to help establish the Catskills RSP (a newly created plan) and review the Garnet RSP (an existing plan).

47.    The Garnet RSP and Catskills RSP had around 1,600 participants with balances and $70 million in assets on a combined basis at that time.

48.    The broker sold Garnet a package of products and services furnished by Principal and designed by Principal to maximize Principal's revenue from fees and other compensation. The bundled Principal package was installed in late 2010 in both the Garnet RSP and Catskills RSP.

49.    The package is structured to generate revenue for Principal in several ways. First, the package requires the Plan to offer a proprietary Principal stable value product, the Principal Fixed Income Guaranteed Option ("PFIGO"). The PFIGO deposits participants' retirement savings into Principal's general account.[8] Principal pays a crediting rate on these deposits—the stable value equivalent of interest, which is reset every six months in advance. Principal earns "spread" on the difference between earnings on the deposits in its own general account and the amount credited

---

[7] Garnet's broker was affiliated with Morgan Stanley in 2010. In 2015, the broker moved to Merrill, and Garnet and the Plan moved with him.

[8] Principal takes title to the assets of its general account, which are invested for the benefit of Principal.

to plan participants pursuant to the PFIGO. Unlike most retirement plan investment products, which charge—and disclose—fixed rates of fees, spread-based products such as the PFIGO allow the provider to keep any upside gains, without disclosing the amount of the spread compensation. The crediting rate is set by Principal in its discretion, based upon criteria for which no disclosures are provided. Thus, spread-based products such as the PFIGO allow the provider to determine its compensation by fixing the crediting rate at a level that produces the desired spread in secret. Unsurprisingly, the PFIGO and similar products are highly profitable for Principal.[9]

50.     Second, to direct the allocation of substantial Plan assets to the PFIGO and to ensure that they remain invested in the PFIGO, the package includes RetireView, Principal's proprietary asset allocation service. RetireView is a set of pre-populated investment models tied to a participant's age and risk tolerance. One set of models serves as the "default" investment option for Plan participants, and additional sets are available to simplify the allocation process for participants who opt out of the default models. Either way, the RetireView program is engineered to ensure that an unusually high percentage of Plan assets are invested in the PFIGO.[10]

---

[9] Spread-based products account for 27% of Principal's total net revenue across all retirement products and services. *See* Principal Financial Group, Inc., Form 10-K dated February 16, 2023, at 53, *available at* https://www.sec.gov/Archives/edgar/data/1126328/000110465923022860/pfg-20221231x10k.htm.

[10] Principal touts RetireView models as "independently" constructed. While Principal licenses shell models from a third-party, Principal itself owns the RetireView service mark, warrants the adequacy of the program, and determines how the program is paired with other products and services in its package offers to plans.

The average 403(b) plan allocation to similar fixed interest products is 16%.[11] The Plan percentage invested in the PFIGO has reached as high as 29% in recent years. Driving more assets to the PFIGO is sufficiently profitable for Principal that it *pays* rather than charges customers to use its RetireView service (*see* Paragraph 126, *infra*).

51.    Third, the Garnet package includes Principal's index funds, which track major asset classes, including U.S. stocks, international stocks, and U.S. bonds. The actual cost of managing these funds is minimal, as competitors offer them at a fraction of the price charged by Principal (*see* Paragraphs 87–89, *infra*).

52.    Fourth, the package includes Principal's actively managed funds in several asset classes, including U.S. stocks, high yield bonds, and real estate. These funds charge premium investment management fees payable to Principal, which are higher than fees charged by comparable products commonly selected by the fiduciaries of peer plans (*see* Paragraphs 95–111, *infra*).

53.    Fifth, the package includes Principal's participant recordkeeping services. This is ostensibly the reason that the Plan invests in revenue sharing versions of funds instead of the identical but lower cost versions of the same investments. The revenue sharing generates additional revenue for Principal (*see* Paragraphs 114, 121, *infra*).

---

[11] *See* BrightScope/ICI, *A Close Look at ERISA 403(b) Plans*, at 33 (Apr. 2024), *available at* www.ici.org/files/2024/24-ppr-dcplan-profile-403b.pdf (hereinafter "BrightScope/ICI Close Look 2024").

54. Sixth, the package includes a schedule of individual transaction fees, including a base fee for withdrawals plus additional charges based on the distribution method utilized (*e.g.*, wire fees, overnight check fees). Multiple leading competitors of Principal do not charge base fees for withdrawals, but the Plan's deal with Principal provides this additional source of revenue to Principal (*see* Paragraph 137, *infra*).

55. Generating revenue for Principal is key to the commissions received by Garnet's broker. Principal paid Garnet's broker commissions totaling around $80,000 in the Plan's first full year with Principal, which was funded by revenue that Principal received from the Plan. According to the Plan's annual report, the broker's total compensation included "sales and base commissions" and "referral/services" and "incentive" fees.

56. The broker continues to receive around $80,000 in annual compensation today, which continues to be funded by revenue that Principal receives from the Plan.

## II.    The Plan's Products and Services Package Requires Close and Independent Monitoring by Garnet.

57. The fact that the Plan was bundled by and profitable for Principal and its broker did not make the Plan's package of products and services imprudent *per se*. But it did create conditions under which scrupulous and independent monitoring by Garnet was necessary to control or—in a market environment in which costs were declining—reduce their cost. Garnet's duty was to put participants' not service providers' interests first. The way the Plan's service providers were compensated required attention to each item to determine that the cost to participants from their retirement savings accounts was a fair trade for the value of the services provided.

58.    Many of the Plan's products and services were priced in 2010 based on assets. The Plan's increase in bargaining power from asset growth combined with pricing declines throughout the industry required re-pricing of the Plan's products and services. Starting in 2012, service providers were required to disclose all compensation and sources to plan fiduciaries.[12] Plan fiduciaries were required to report plan fees and the net performance of plan investments relative to appropriate benchmarks.[13] Garnet had the market power to leverage this information to obtain more competitive pricing. In the employer-sponsored retirement marketplace, growth is buying power, and larger plans such as the Plan can leverage information to obtain better terms and pricing.[14]

59.    Garnet's peers, at least the prudent ones, leveraged the new disclosures not just to control but to reduce fees and expenses. Between 2010 and the beginning of the statutory period in 2018, total costs throughout the retirement marketplace fell by 20% for plans like the Plan with more than $100 million in assets.[15] Consultants attributed the industry changes and the attendant drop in fees to "fiduciary

---

[12] 77 Fed. Reg. 5632 (Feb. 3, 2012); 29 C.F.R. § 2550.408b-2(c).

[13] 75 Fed. Reg. 64937; 76 Fed. Reg. 42542; 29 C.F.R. § 2550.404a-5.

[14] *E.g.*, BrightScope/ICI Close Look 2024, at 38-39, 41 (demonstrating that total plan costs and funds fees decline, as a percentage of assets, as assets increase).

[15] *See* BrightScope/ICI, *A Close Look at ERISA 403(b) Plans*, at 38 (Mar. 2022), *available at* https://www.ici.org/system/files/2022-03/22_ppr_dcplan_profile_403b.pdf    (hereinafter "BrightScope/ICI Close Look 2022").

concerns", "transparency", "intermediary sophistication", and "unbundling asset management and recordkeeping."[16]

60.     By the beginning of the statutory period in 2018 the need for critical and independent review of the Plan's products and services would have been readily apparent to any cost-conscious fiduciary. The Plan had tripled in assets since 2010 and nearly doubled the number of participants but still maintained the same entry-level package of bundled services and products that Principal was marketing to small, unsophisticated plans back in 2010 prior to the major industry changes and industry-wide reductions in retirement plan fees and expenses.

61.     The need to re-price the Plan's products and services was acute at the beginning of the statutory period and grew during it. An average plan the size of the Plan in 2018 ($178 million) cost 28% less that an average plan the size of the Plan in 2010 ($70 million).[17] The Plan continued to grow after 2018 during the statutory period, quadrupling its 2010 size, without reducing costs, while costs for peer plans continued to fall.

62.     Garnet could not expect Principal to help the Plan navigate its growth and the range of options available to the Plan. Principal is a seller that dealt with the Plan at arm's-length, not a fiduciary obligated to act in the best interest of the Plan.

---

[16] McKinsey & Company, Long-term valuation creation in US retirement, at 1-2 (Aug. 2019), *available at* https://www.mckinsey.com/~/media/mckinsey/industries/financial%20services/our%20insights/long%20term%20value%20creation%20in%20us%20retirement/long-term-value-creation-in-us-retirement.pdf.

[17] *See* BrightScope/ICI Close Look 2022, at 38.

Garnet needed to treat Principal at arm's-length and understand Principal's market position and how it packaged its offers. Principal is primarily a small plan provider. Most of its customers hold only around $1 million in assets.[18] Principal's model is to package administrative services with proprietary investment products as a means to sell proprietary products to small- and medium-sized companies.[19] Garnet was not required to rule out Principal on this basis, but Garnet had to understand its role as a fiduciary: to leverage the Plan's size to get Principal's best offer and compare it to alternatives in the large plan marketplace.

63.    Garnet could not rely on its broker to monitor costs because the broker's interests were conflicted. Garnet received investment advice from its broker.[20] But, the broker's compensation was generated based upon the arrangement made with Principal. The broker could not advise Garnet to replace Principal without putting its own compensation at risk.

64.    There were standard fiduciary processes that Garnet could have implemented to satisfy its duty of independent monitoring. Garnet had to collect,

---

[18] *Rozo v. Principal Life Ins. Co.*, 2021 WL 1837539, at *2 (S.D. Iowa Apr. 8, 2021) ("Most of the plans for which Principal provides services have approximately $1 million in plan assets[.]"), *aff'd*, 48 F.4th 589 (8th Cir. 2022). The simple average plan balance of a Principal customer in 2020 was $6.15 million (see source cited *infra* note 19), but the evidence in *Rozo* suggests that the distribution curve places the majority of customers around the $1 million mark or less.

[19] *See* Principal Financial Group, Inc., Form 10-K dated February 14, 2020, at 5 (describing "Full Service Accumulation" packaging of administrative and investment services and emphasis on small and mid-sized companies), *available at* https://www.sec.gov/Archives/edgar/data/1126328/000110465920021174/pfg-20191231x10k0da4e5.htm.

[20] The Plan's Form 5500 filings attribute the broker's compensation to Code 27 meaning "investment advisory (plan)".

review, understand, and critically assess the DOL mandated service provider compensation disclosures.

65.    Garnet had to test the market, such as by requesting product and pricing information from competing vendors of retirement products and services in a process known as a "Request for Information" or "RFI"[21] or by requesting detailed proposals from Principal and competing vendors through a process known as a "Request for Proposals" or "RFP".[22]

66.    Had Garnet implemented these standard fiduciary processes Garnet would have been able to obtain more competitive pricing for products and services of the same or better quality.

## III.    Garnet Fails to Monitor and Replace its Small-Plan, Entry-Level Principal Stable Value Product.

67.    The Plan has had the same small-plan, entry-level Principal stable value product, the PFIGO, since 2010. Had Garnet implemented a prudent and independent monitoring process during the statutory period it would have removed the entry-level PFIGO product and replaced it with one of the more competitive stable value products readily available from other providers or even Principal itself. The

---

[21] The marketplace is highly competitive for investment products and administrative services and vendors regularly respond to RFIs to inform prospective buyers about their products and services.

[22] An RFP is more in depth than an RFI and allows the requestor to obtain customized proposals and answers to specific questions regarding the vendor's experience. The more in-depth RFP process allows requestors to ensure that a vendor is qualified and offering the most favorable terms tailored to the requestor's needs. An RFP can request both package offers and unbundled offers of individual products and services to allow the fiduciary to consider the best approach for their plan. Vendors regularly respond to RFPs from plans with large asset bases such as the Plan given the size of the revenue opportunity.

crediting rates of the PFIGO were and have remained for a decade and a half substantially below the rates offered by leading providers and enjoyed by peer plans. Even the most basic monitoring process would have identified stable value products with higher crediting rates for comparable risk readily available from any number of leading stable value providers. During the statutory period, the crediting rates of the PFIGO were in the 1.7% range, while the crediting rates of comparable products for peer plans were in the 3.1% range, and the crediting rates of the leading provider were in the 3.4 % range. The only plausible explanation for Garnet's continued retention of the PFIGO is that Garnet deferred to Principal and its broker and did not conduct its own critical and independent product review.

68.    The tools available for monitoring and comparing spread-based stable value products such as the PFIGO are the same tools that are generally available to fiduciaries for other investment products (*see* Paragraphs 64–65, *supra*), but with a heightened emphasis on a thorough understanding of the product, knowledge of the relevant market, and competitive bidding. Product disclosures (*e.g.*, fact sheets) are less useful for spread-based products than fee-based products because the regulatory regimes and products structures are different. Mutual funds are regulated under federal securities laws and are required to make robust disclosures of fees, assets, performance, benchmarks, and fund operations. Securities products are also structured intuitively to pass asset returns directly to investors, net of disclosed fees. Spread-based products are regulated by state insurance laws, which do not require

detailed pricing, asset, operations, performance, or benchmark disclosures.[23] Because the product is structured as an insurance contract, an investor must understand the contract terms relevant to its investment experience, including asset ownership and credit risk; minimum and maximum rates; asset charges and other fees; declaration of crediting rates; equity wash, surrender charges, and other participant=level liquidity restrictions; termination, withdrawal restrictions, and other plan-level liquidity restrictions. The structure of stable value products, for plan sponsors accustomed to evaluating mutual funds, is anything but intuitive.

69.    The crediting rate setting process for the PFIGO at Principal is secretive and complicated. As a practical matter, to effectively monitor the crediting rate of a spread-based product such as the PFIGO, a fiduciary must utilize RFIs and RFPs to compare it to the other stable value products available in the marketplace. Bidding out the product is especially important for a plan as large as the Plan. A plan with $70 million, or even $25 million, invested in a stable value product has substantial bargaining power in the marketplace and can select from numerous products that are simply not available to smaller plans. The bidding process allows a large plan, such as the Plan, to access stable value products on competitive terms. A plan the size of the Plan does not have to settle for a small=plan, entry-level product such as the PFIGO.

---

[23] Insurance companies disclose their assets and results of operations to state regulators at the company level but not the product level. Company level disclosures have limited value because products are generally associated with specific pools of assets that are not differentiated in company level reporting.

70.     Garnet's failure to engage in a prudent process concerning the Plan's stable value product is apparent from the steep decline in PFIGO crediting rates since the Plan subscribed, the superiority of comparable market alternatives, and the selections of similarly situated fiduciaries.

71.     The PFIGO's crediting rate dropped precipitously since the Plan first invested in 2010. After paying 2.85% in 2011, the rate dropped nearly 50% to its current rate of 1.55%. The average rate since 2018 is around 1.70%.

72.     The marketplace did not experience the same decline. Since 2018, large stable value contracts in peer plans have paid 3.00% or more on average. Peer plans held high-rate contracts with multiple providers including TIAA, Transamerica, and Lincoln.

73.     Products with higher crediting rates were available to the Plan without additional risk or restrictions. The leading provider of stable value products to 403(b) plans, TIAA, offers a product, TIAA Traditional Retirement Choice Plus ("RC Plus"), with substantially similar terms to the PFIGO: (a) participants can withdraw their accounts from the plan without additional fees or penalties; (b) participants can move their accounts between the product and other options without additional fees or penalties, subject only to a waiting period to move to other options in the same asset class; and (c) plans can exit the contract without surrender fees or penalties with

advance notice. Since 2018, the RC Plus has paid rates averaging 3.4% to 403(b) plans with a similar amount of assets and number of participants as the Plan.[24]

74.    The relevant market has rejected the PFIGO. Only one other plan in the Plan's peer group of 39 plans (*see* note 25, *infra*) invested in the PFIGO during the relevant time.

75.    The following graph presents findings related to the disparity in crediting rates between the PFIGO and products found in peer plans.[25]



**Difference in Crediting Rates (in % per annum)**

Legend: ■ Peer Plans Average  ■ TIAA RC Plus  ■ PFIGO

---

[24] The RC Plus also has a higher minimum rate. The RC Plus will never pay a rate lower than 1.00%, whereas the PFIGO's minimum rate is 0.15%.

[25] The Peer Plans group includes all private sector (*i.e.*, ERISA-governed) 403(b) plans with between $146 million and $346 million in total assets, between 2,366 and 4,366 participants with account balances (*i.e.*, all plans within $100 million and 1,000 participants of the Plan as of year-end 2022), and more than $25 million invested in insurance company general account guaranteed products, as of year-end 2022. This chart has been updated to include information through 2023. The Peer Plans average crediting rate for each year is the asset-weighted average crediting rate received by Peer Plans on investments of $25 million or more in insurance company general account guaranteed products.

76.     This table compares rates through 2023 because 2023 is the most recent year for which complete DOL filings are available to analyze comparable products held             be             similar             plans.

| Crediting Rate | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Peer Plans Average | 3.22 | 3.12 | 3.15 | 2.83 | 3.02 | 3.52 |
| TIAA RC Plus | 3.37 | 3.26 | 3.25 | 2.80 | 3.42 | 4.05 |
| PFIGO | 1.73 | 1.78 | 1.83 | 1.57 | 1.59 | 1.73 |

77.     The crediting rates experienced by the peer plans as well as the RC Plus in particular were coupled with total protection of principal, and without exposing the Plan to additional risk compared to the PFIGO.[26] The differences in returns are not attributable to the peer plans or the RC Plus taking on any additional risk; instead, they are the product of provider scale, costs, and sophistication.

78.     In recent years, other large PFIGO investors have negotiated higher rates directly from Principal through custom products. For example, Norton Healthcare left the PFIGO in 2019 and replaced it with a custom stable value product from Principal. In a custom product, a plan with large stable value assets avoids the rate-setting economics of an off-shelf product that is sold primarily to small plans. Norton Healthcare's rates since the switch have been around 0.70% higher, on average, than the PFIGO's rates, without accepting additional risk.[27]

---

[26] TIAA has consistently maintained the same or superior credit ratings compared to Principal, which means that TIAA is deemed to expose investors to less risk of default on its guarantees.

[27] Norton Healthcare's custom rates (annualized) reported in its DOL filings were as follows: 2020: 2.63%; 2021: 2.23%; 2022: 2.18%.

79.     Norton Healthcare's specific experience in addition to the rates received by peer plans demonstrate the standard of care exercised by prudent fiduciaries of retirement plans with over $25 million in assets within a stable value investment. Because of the lack of transparency associated with general account products, prudent fiduciaries of such plans investigate the stable value marketplace by soliciting bids from competitors. In comparing products, fiduciaries first ensure that every option they consider provides protection of principal to their participants. When selecting among products that offer similar principal protection and level of risk, prudent fiduciaries then seek to provide the highest level of income to participants, considering factors such as the guaranteed minimum crediting rate, the underlying investments, the quality of the issuer, and the historical crediting rates of the product being considered.

80.     Given the relatively low crediting rates experienced by the Plan, its use of the same product for the past fifteen years, and the availability of better-performing products with similar principal protection and overall levels of risk, it is reasonable to infer that Garnet has failed to prudently monitor or investigate the stable value marketplace to the detriment of Plaintiffs and other Plan participants. Had Garnet taken the simple step of checking the crediting rates offered by the leading provider of stable value products (TIAA) to peer plans for a comparable product (RC Plus), Garnet would have known that the entry-level PFIGO product was deficient and that superior products were readily available. Had Garnet implemented a robust monitoring process, Garnet would have realized that the crediting rate of

the PFIGO was substantially below market and that the Plan was badly out of step with its peers. Garnet would have been compelled to remove the PFIGO and to replace it with a product with higher crediting rates from TIAA or any of the other leading stable value providers.

## IV.    Garnet Fails to Monitor and Replace Principal's Index Funds.

81.    The bundled package of Principal product and services included a series of Principal index funds. The Plan has held the same four Principal index funds[28] that it selected in 2010. Had Garnet implemented a prudent process that compared the Principal index funds to the funds available in the marketplace the funds would have long since been removed and replaced. The Principal funds are two to five times more costly than superior products readily available in the marketplace from leading industry providers. Here again, the only explanation for the retention of Principal index funds was a decade and a half of blind deference by Garnet to Principal and its broker.

82.    An index fund is a passively managed, pooled investment product designed to mirror the performance of a particular benchmark index. S&P 500 index funds, for example, aim to track the Standard & Poor's 500 Index, a market capitalization-weighted index of 500 of the largest publicly traded companies in the United States. Other index funds track other published securities indices.

83.     Success for an index fund manager is measured, among other factors, by tracking the relevant index as closely as possible. A fiduciary selecting an index

---

[28] The count is seven if multiple share classes are included.

fund provider must look for a demonstrated track record of generating returns that match the index.

84.    Success also is measured in terms of cost. Assuming that a provider matches the gross return of the index, the net return for participants is the index fund's return minus investment management fees and other expenses (such as trading costs). To be successful an index fund must be low cost.

85.    The marketplace for index funds is highly competitive, with several firms offering index fund products that track benchmark indices with a high degree of precision and charge very low fees. The leading providers have distinguished themselves in the marketplace based on several competitive advantages: a high degree of institutional expertise at indexing, sophisticated trading platforms that minimize trading costs, and a large asset base that provides economies of scale. As a result, these companies—which include Vanguard, BlackRock, Fidelity, State Street, Northern Trust, and BNY Mellon—have captured a large share of passively managed assets among retirement plans.

86.    Principal is not competitive in the index fund market. For the past decade or more, Principal index funds have borne high rates of underperformance due to persistent failures to match the index. This means that Principal index funds are among the worst performing index funds in the marketplace even on a pre-fee basis. Principal then charges fees that are 2–5 times higher (or more) than alternatives that track the exact same indices, further reducing investors' net returns.

87.    During the 10-year period between 2014 and 2023, the Plan's largest index fund holding, the Principal LargeCap S&P 500 Index Fund, underperformed the S&P 500 index by an average of 0.20% per year. The fund's fees during this period averaged 0.16% per year, meaning Principal missed the index return by an average of around 0.04% per year. During the same period, market leaders charged lower fees and had no problem matching the index return. Fidelity's S&P 500 Index Fund (FXAIX) charged fees of around 0.02% and generated returns over the same period equal to the index minus 0.02%. Vanguard's S&P 500 Index Fund (VFIAX) charged fees of around 0.04% and generated returns equal to the index minus 0.04%.

88.    Not surprisingly, fiduciaries of large plans overwhelmingly prefer low-cost index funds from leading providers. Among all 403(b) plans with asset totals within $100 million of the Plan's total assets,[29] 143 invest in Vanguard's S&P 500 index fund, and 101 invest in Fidelity's S&P 500 Index Fund. Only two such plans (other than the Plan) invest in Principal's S&P 500 Index Fund.[30]

89.    Similarly, as of the end of 2023 the Plan held just under $10 million in the Principal Bond Market Index Fund, an index fund that tracks the Bloomberg US

---

[29] This peer exercise includes all ERISA-governed 403(b) plans with between $146 million and $346 million in assets. There were 349 such plans as of year-end 2022. A larger peer universe is more relevant for this exercise than the stable value exercise (*see* Paragraph 74–75 and note 25, *supra*) because product-level assets do not influence product availability or investment terms to the same degree. The Fidelity S&P 500 Index Fund that costs around 0.02% is available to all plans without a minimum investment. Vanguard's S&P 500 Index Fund that costs around 0.04% also has no minimum for institutional investors, including large 403(b) plans.

[30] Both of the plans using the Principal S&P 500 Index Fund were record kept by Principal, and thus were likely not selected and retained through an objective process, similar to the procedural maladies plaguing the Plan.

Aggregate Bond Market Index. During the 10-year period ending September 30, 2024, the fund underperformed its benchmark index by an average of 0.22% per year, with an expense ratio of 0.14% as of September 30, 2024. Over that same period, the Fidelity U.S. Bond Index Fund (FXNAX) charged fees of 0.00% and trailed the same index by only 0.02% during the same period; Blackrock's U.S. Aggregate Bond Index (WFBIX) trailed the same index by 0.04% per year with annual expenses of 0.05%; and Vanguard's Total Bond Market Index Fund (VBTLX) tracking a materially identical index[31] by 0.02% annually with expenses of 0.05%. The Principal Bond Market Index Fund employed by the Plan trailed its index by at least four times more than every one of these funds. And this performance was entirely foreseeable given the higher fees associated with the Principal option, as well as the firm's history of poor index tracking, even gross of fees.

90.     The 403(b) marketplace demonstrates this as well. Seventy 403(b) plans with between $146 and $346 million in assets[32] used the Fidelity U.S. Bond Index Fund; five of those plans used the Blackrock U.S. Aggregate Bond Index; another five plans used the State Street Aggregate Bond Index Fund; and 184 plans within the peer group used the Vanguard Total Bond Market Index Fund. In comparison, not a single 403(b) plan in this peer group other than the Plan used the Principal Bond Market Index Fund.

---

[31] Vanguard's Total Bond Market Index Fund tracks the float-adjusted version of the Bloomberg US Aggregate Bond Index. The float-adjusted index contains the same underlying securities, but adjusts the weighting of securities based on each bond's float, or tradeable portion of its overall offering. Performance of the two indices varies over the prior decade by only 0.03% annually.

[32] *See supra* note 29 for peer group description.

91.    The mid- and small-cap equity index peer group comparisons are complicated by Principal's use of non-standard indices. Principal tracks the S&P MidCap 400 and S&P SmallCap 600 Index, while the large majority of small-and mid-cap index funds track the Russell 2000 Index and the Russell Mid Cap Index, respectively.[33] Despite that, there were still better-performing, lower-cost index funds tracking each index. The Principal MidCap S&P 400 Index Fund trailed its index by 0.25% for the 10 years ending September 30, 2024, with expenses of 0.16% per year. Yet the Northern Mid Cap Index Fund (NOMIX) trailed by only 0.15% per year with fees of 0.10%, while the Vanguard S&P Mid-Cap 400 Index Fund (VSPMX) trailed the index by only 0.07% per year with fees of 0.08% per year.[34] Though few plans utilize mid-cap funds tracking the S&P proprietary index, 51 plans used a Fidelity Mid Cap Index Fund (FSMDX), and 117 used a Vanguard mid-cap index fund, while only seven plans other than the Plan used the Principal MidCap S&P 400 Index Fund, five of those plans used Principal as a recordkeeper, and all of those plans had less money in the fund than the Plan.

92.    The Plan is one of only six plans in the 403(b) peer group to utilize the Principal SmallCap S&P 600 Index Fund, and five of those plans are recordkept by Principal. 121 plans in the peer group utilize a Vanguard small cap index fund, four

---

[33] Plaintiffs do not allege that Defendant breached its fiduciary duties by picking an index fund tracking the S&P 400 or S&P 600. However, Plaintiffs *do* allege that the selection of these funds occurred because they were the mid- and small-cap index funds that Principal offered, not because of a preference for either underlying index.

[34] Vanguard and Fidelity's mid-cap index funds tracking the Russell MidCap Index had expenses under 0.05% and also trailed the index by less than 0.05% over the prior decade ending September 30, 2024.

of which utilize the Vanguard S&P Small-Cap 600 Index Fund (VSMSX). 46 plans in the peer group utilize a Fidelity small-cap index fund. The Vanguard S&P Small-Cap 600 Index Fund is a clearly superior option to the Principal option held by the Plan, having trailed the underlying index by only 0.01% over the past decade (with annualized fees of 0.08%), while the Principal option held by the Plan has trailed the same index by 0.21% over the past decade (with annualized fees of 0.17%).

93.    Finally, the Plan had less than a million dollars in the Principal International Equity Index Fund, which tracks the MSCI EAFE Index. Only two plans within the peer group hold this fund, and both are recordkept by Principal.[35] The fund charges 0.31% in expenses, compared to 0.10% for Blackrock's MSCI EAFE International Index Fund (MAIIX) and 0.00% for Fidelity's MSCI EAFE International Index Fund (MDIIX) index funds tracking the same index. These two funds have outperformed Principal's offering over the past decade by 0.22% and 0.34% annually, respectively. The superiority of these offerings is reflected in peer group conduct: eight plans offer BlackRock's international index fund, while 57 offer the Fidelity International Index fund.

94.    Based on the forgoing it is reasonable to infer that Garnet has failed to prudently monitor the expenses and index-tracking skill of the Plan's index funds. Had Garnet performed its monitoring duties, it would have realized that obviously superior, materially identical options were available in the marketplace that would have yielded better results for participants.

---

[35] *See* note 29, *supra.*

## V. Garnet Fails to Monitor or Replace Underperforming Principal Actively Managed Funds.

95.    Garnet's deference to Principal also resulted in the imprudent retention of actively managed Principal funds. All six of the actively managed Principal funds added to the Plan in 2010 have remained. Two of these funds—(i) Principal LargeCap Growth Fund I, R5 Shares and (ii) Principal Strategic Asset Management Balanced Portfolio, R5 Shares—persistently and severely underperformed their benchmarks over the statutory period resulting in losses suffered by the Plan and participants. Two other funds—(iii) Principal Equity Income, R5 shares, and (iv) Principal High Yield, A shares—have struggled to perform in line with their benchmarks, and were retained despite numerous alternatives in the marketplace that were better performing, with lower fees, and were in much wider use among other fiduciaries.

96.    The Plan has approximately 7% of its assets invested in R5 shares of the Principal LargeCap Growth Fund I and 2% of its assets invested in R5 shares of the Principal Strategic Asset Management Balanced Portfolio Fund. The Principal LargeCap Growth Fund I R5 has underperformed its benchmark index, the Russell 1000 Growth Index, for five consecutive calendar years. The Principal Strategic Asset Management Balanced Portfolio has underperformed its benchmark index, SAM Balanced Blended Index / Morningstar Moderately Aggressive Target Risk Index, for four out of the past five calendar years. Both funds have underperformed over longer time periods as well, underperforming their respective benchmark indices over the past 10 years, and over the past 15 years.

36

97.    This is not mere hindsight bias: a prudent fiduciary evaluates actively managed funds on an annual basis, at a minimum, to determine whether the costs of active management are justified by a manager's ability to identify inefficiency within its sub asset class, thus making it likely that the investment will outperform its benchmark index. *See* Restatement (Third) § 90 cmt h(2). Absent such a likelihood, a prudent fiduciary will use a passive investment. *See id.*

98.    To assess the performance of a fund, prudent fiduciaries typically analyze the previous 3-year, 5-year, and 10-year periods of time. Fiduciaries generally do not consider performance over periods longer than a decade.

99.    As of the end of 2021, Principal LargeCap Growth Fund I and Principal Strategic Asset Management Balanced Portfolio both had underperformed their benchmark indices over the prior 3, 5, and 10-year periods. The same was true for both funds at the end of 2021, at the end of 2022, and at the end of 2023.

100.    A prudent fiduciary faced with evidence of long-term underperformance will at the very least perform further analysis to determine whether the investment remains prudent for the Plan. The duty to perform such an investigation in cases such as the present one where the original selection of the fund was tainted by the interests of the Plan's recordkeeper.

101.    With regard to the Principal LargeCap Growth Fund I, an investigation of other large-cap growth options in the marketplace would have revealed that there were several options that had lower costs, better performance, and were in much wider use among fiduciaries.

**Performance as of 12/31/2021**

| Fund Name | Ticker | 3-Year | 5-Year | 10-Year | Expense Ratio |
|---|---|---|---|---|---|
| Russell 1000 Growth Index | RLG | 34.07 | 25.32 | 19.79 | |
| T. Rowe Price/ Brown Advising Large Cap Growth I R 5 Fund | PPUPX | 30.5 | 25.13 | 19.07 | 0.85% |
| Difference | | (3.57) | (0.19) | (0.72) | |
| Fidelity Blue Chip Growth K | FBGKX | 38.62 | 29.7 | 22.37 | 0.79% |
| Difference | | 4.55 | 4.38 | 2.58 | |
| Fidelity Growth Company K | FGCKX | 41.79 | 30.11 | 23.12 | 0.75% |
| Difference | | 7.72 | 4.79 | 3.33 | |
| JPMorgan Large Cap Growth R6 | JLGMX | 37.33 | 29.23 | 20.3 | 0.44% |
| Difference | | 3.26 | 3.91 | 0.51 | |
| Vanguard Russell 1000 Growth Index | VRGWX | 33.98 | 25.23 | 19.7 | 0.07% |
| Difference | | (0.09) | (0.09) | (0.09) | |

102.    Eight other plans in the peer group use the Principal LargeCap Growth Fund I, though half of them are recordkept by Principal. In comparison, 30 plans use Fidelity Blue Chip Growth, 41 plans use Fidelity Growth Company, 33 plans use the JPMorgan Large Cap Growth Fund, and 26 plans use a Vanguard index fund to track a large-cap growth index.

103.    With regard to the Principal Strategic Asset Management Balanced Portfolio, an investigation of other balanced options in the marketplace also would have revealed that there were several options that had lower costs, better performance, and were in much wider use among fiduciaries.

**Performance as of 12/31/2021**

| Fund Name | Ticker | 3-Year | 5-Year | 10-Year | Expense Ratio |
|---|---|---|---|---|---|
| SAM Balanced Blended Index / Morningstar Moderately Aggressive Target Risk Index | | 16.75 | 12.03 | 10.60 | |
| Principal Strategic Asset Management Balanced Portfolio R5 | PSBFX | 14.56 | 10.31 | 9.19 | 1.07% |
| Difference | | (2.19) | (1.72) | (1.41) | |
| Vanguard Balanced Index Fund Institutional | VBAIX | 17.42 | 12.37 | 11.00 | 0.06% |
| Difference | | 0.67 | 0.34 | 0.40 | |
| Fidelity Puritan K | FPUKX | 20.35 | 14.71 | 12.47 | 0.43% |
| Difference | | 3.60 | 2.68 | 1.87 | |
| Vanguard Wellington Adm | VWENX | 17.36 | 12.4 | 11.46 | 0.16% |
| Difference | | 0.61 | 0.37 | 0.86 | |
| Fidelity Balanced K | FBAKX | 21.77 | 15.12 | 12.62 | 0.43% |
| Difference | | 5.02 | 3.09 | 2.02 | |

104. The Plan was the only plan within the peer group that held the Principal Strategic Asset Management Balanced mutual fund as of the end of 2022. By comparison, 15 plans held Vanguard Balanced Index, 29 plans held Fidelity Puritan, 24 plans held Vanguard Wellington, and 29 plans held Fidelity Balanced.

105. Principal Equity Income is a large cap value fund that tracks the Russell 1000 Value Index. In late 2021, the manager of the fund since its inception retired. Its performance since that point had hardly been inspiring, performing roughly in line with its index over the decade since the fund's inception, with fees that were materially higher than many of its peers that were in much wider use among other fiduciaries:

**Performance as of 12/31/2021**

| Fund Name | Ticker | 3-Year | 5-Year | 10-Year | Fees |
|---|---|---|---|---|---|
| Russell 1000 Value Index | | 17.62 | 11.14 | 12.96 | |
| Principal Equity Income R5 Fund | PEIQX | 18.6 | 13.78 | 12.97 | 0.77% |
| Difference | | 0.98 | 2.64 | 0.01 | |
| Vanguard Russell 1000 Value Index I | VRVIX | 17.59 | 11.11 | 12.88 | 0.07% |
| Difference | | (0.03) | (0.03) | (0.08) | |
| Dodge&Cox Stock I | DODGX | 20.78 | 14.14 | 15.57 | 0.52% |
| Difference | | 3.16 | 3.00 | 2.61 | |
| Vanguard Windsor Adm | VWNEX | 21.6 | 13.44 | 14.2 | 0.19% |
| Difference | | 3.98 | 2.3 | 1.24 | |
| Invesco Comstock R6 | ICSFX | 18.82 | 11.83 | 13.22 | 0.42% |
| Difference | | 1.2 | 0.69 | 0.26 | |
| Putnam Large Cap Value R6 | PEQSX | 20.8 | 14.08 | 14.32 | 0.55% |
| Difference | | 3.18 | 2.94 | 1.36 | |

106. Though a prudent fiduciary would not necessarily remove a fund from its lineup solely due to the retirement of its manager, prudent fiduciaries put such funds on a watch list, and closely monitor subsequent performance to consider removal. Further, given the higher fees compared with other options and mediocre

returns, a marketplace investigation likely would have resulted in replacement of the option when the manager retired.

107.   Any question about the continued viability of Principal Equity Income was removed over the next two years, as the fund materially underperformed its benchmark index under the new management.

**Performance as of 12/31/2023**

| Fund Name | Ticker | 3-Year | 5-Year | 10-Year | Fees |
|---|---|---|---|---|---|
| Russell 1000 Value Index | | 8.82 | 10.88 | 8.38 | |
| Principal Equity Income R5 Fund | PEIQX | 6.48 | 10.54 | 8.89 | 0.77% |
| Difference | | (2.34) | (0.34) | 0.51 | |
| Vanguard Russell 1000 Value Index I | VRVIX | 8.79 | 10.85 | 8.32 | 0.07% |
| Difference | | (0.03) | (0.03) | (0.06) | |
| Dodge&Cox Stock I | DODGX | 12.81 | 13.94 | 10.45 | 0.51% |
| Difference | | 3.99 | 3.06 | 2.07 | |
| Vanguard Windsor Adm | VWNEX | 12.67 | 14.95 | 9.84 | 0.28% |
| Difference | | 3.85 | 4.07 | 1.46 | |
| Invesco Comstock R6 | ICSFX | 15.12 | 13.84 | 9.34 | 0.45% |
| Difference | | 6.3 | 2.96 | 0.96 | |
| Putnam Large Cap Value R6 | PEQSX | 12.75 | 14.69 | 10.53 | 0.55% |
| Difference | | 3.93 | 3.81 | 2.15 | |

108.   The imprudence of retaining Principal Equity Income is apparent when looking at the conduct of similar fiduciaries. Within the peer group, the Plan was the only plan holding the Principal Equity Income Fund as of the end of 2022. In comparison, 31 other plans held Dodge & Cox Stock, 11 plains held Invesco Comstock, eight plans held Vanguard Windsor, four plans held Putnam Large Cap Value, and 20 plans held a Vanguard index fund tracking a large-cap-value index.

109.   The Principal High Yield Fund, A shares was also demonstrably imprudent. As of the end of 2021, it had trailed its benchmark index over the prior 3, 5, and 10 years, while marketplace alternatives had performed better over all time periods, with lower costs.

**Performance as of 12/31/2021**

| Fund Name | Ticker | 3-Year | 5-Year | 10-Year | Expense Ratio |
|---|---|---|---|---|---|
| Bloomberg US High Yld 2% Issuer Capped Index | | 8.81 | 6.28 | 7.08 | |
| Principal High Yield Fund (A) | CPHYX | 8.20 | 5.38 | 6.17 | 0.92% |
| Difference | | (0.61) | (0.90) | (0.91) | |
| BlackRock High Yield Bond K | BRHYX | 9.03 | 6.42 | 7.08 | 0.48% |
| Difference | | 0.22 | 0.14 | 0 | |
| Fidelity Capital & Income | FAGIX | 13.55 | 9.02 | 8.64 | 0.68% |
| Difference | | 4.74 | 2.74 | 1.56 | |
| Fidelity Advisor High Income Advantage Z | FIQTX | 12.39 | 8.37 | 8.28 | 0.64% |
| Difference | | 3.58 | 2.09 | 1.20 | |

110. Only two plans other than the Plan held the Principal High Yield Fund as of the end of 2022, while 25 plans held one of the two Fidelity high-yield bond funds, and 32 plans held BlackRock's high yield fund. The conduct of other fiduciaries thus further demonstrates that a prudent fiduciary would have removed the Principal High Yield Fund.

111. Despite persistent evidence from the past six years that the Principal LargeCap Growth, Strategic Asset Management Balanced Portfolio, High Yield, and Equity Income Funds were performing poorly, and unlikely to outperform their benchmarks going forward, the Defendant failed to remove the funds in favor of marketplace alternatives with lower costs and better track records. The failure to remove such proprietary actively managed funds has caused significant losses for the Plan's participants.

## VI. Garnet Fails to Monitor, Reprice, or Bid Out the Plan's Administrative Services.

112. Garnet has also failed to leverage the Plan's size to reduce administrative services fees for participants.

41

113.    Principal bundles its administrative services with its investment products in a business line that was long known as "Full Service Accumulation" or "FSA." Through FSA, Principal's goal is to capture assets in Principal investment products. For example, in 2019[36] approximately one-half of FSA assets were invested in Principal products, with more than one-half of the Plan so invested.[37]

114.    Driving assets to Principal investment products is so fundamental to Principal's FSA program that its administrative services pricing is inextricably intertwined with its investment product revenue. The more investment product revenue Principal receives, the less Principal charges for administrative fees.

115.    Pricing FSA products is a two-step process. As part of the first step, Principal calculates the investment services fees and spread that it expects to receive from Principal products. Based on that figure, Principal determines whether additional revenue is needed to cover the cost of administrative services Principal's customer has agreed to pay. Principal then bills that additional amount to the customer.

116.    As part of the second step, the customer, with guidance from Principal, decides how to pay the administrative services bill. There are a range of options: the sponsor can pay; plan participants can pay a fixed dollar amount per participant; plan

---

[36] Principal acquired the defined contribution plan recordkeeping business of Wells Fargo Bank in 2019 and folded Wells Fargo clients onto its recordkeeping platform over the course of the next few years. Wells Fargo did not historically push Principal products, so the acquisition reduced the percentage of FSA assets invested in Principal products.

[37] *See* note 19, *supra*. Principal reported to its investors that 47% of FSA assets were invested in products fully managed by Principal while an additional 8% were invested in Principal-branded products sub-advised by other firms.

participants can pay a fixed percentage of their account balances; the fiduciaries can choose investment fund classes that share revenue with Principal to cover administrative fees; or the plan may combine multiple methods.

117.    In the first step, Principal applies internal "credits" for investing in Principal products. These credits reduce the amount that Principal bills the customer for administrative services.[38] Principal does not consider pre-bill credits to be subject to automatic disclosure to plan fiduciaries under ERISA regulations. However, Principal notifies fiduciaries that its administrative services pricing is generally tied to the plan's decision to invest in particular Principal products and subject to change if proprietary products are removed, added, or changed.[39] For competitive reasons, Principal may disclose specific credits applied to a customer's rate.[40]

118.    In the second step, if the company chooses to pass administrative costs on to participants, fees are deducted from the plan's assets to cover the amount billed. Such fees are subject to automatic disclosure to plan fiduciaries under ERISA

---

[38] In prior litigation, Principal revealed that it applied a 0.30% discount on assets invested in its guaranteed fund when it priced administrative services for each customer. *See Rozo*, 2021 WL 1837539, at *8. The court referred to this discount as a "credit." *Id*.

[39] Standard language in Principal's disclosures to plan fiduciaries includes the statement: "The above illustrated Recordkeeping Fee assumes the plan will utilize an approved Principal guaranteed investment option. As plan characteristics or services selected change or investment options are added, changed or removed, recordkeeping fees will be reviewed and may change." Such disclosures continued to be standard during the relevant period, including for plans that offer the PFIGO as the "Principal guaranteed investment option." Therefore, it is reasonable to infer that Principal's administrative fee crediting practices described in *Rozo* continued in similar form during the relevant period, and that administrative fee credits were generally applied or available to plans that invested significant assets in the PFIGO and other Principal products, including the Plan.

[40] Principal has advertised a specific 0.05% pre-bill credit to customers who use the RetireView program in communications to plan fiduciaries.

regulations. For example, Principal has agreements with managers of unaffiliated investment products that certain classes of those products that have extra fees baked in will pay the extra fees to Principal to cover administrative costs.[41] Such "revenue sharing" must be disclosed to plan fiduciaries and is a well-known—if increasingly disfavored[42]—method of paying for administrative services. Principal can also add revenue sharing to its own products, which applies in addition to the pre-bill revenue credits deducted in step one.[43]

119.    Principal and the brokers on which it relies to sell FSA packages tend to push customers toward revenue sharing. Principal tells its customers that it will keep track of its own compensation annually and provide rebates if it receives more revenue sharing payments than expected.

120.    At the same time, Principal expressly disclaims any fiduciary responsibility to monitor or reduce fees on behalf of its customers. Principal clearly discloses to customers that the plan fiduciaries are solely responsible for deciding whether the fee rate charged and the class of investments selected are appropriate.

---

[41] The concept of "extra" fees is known in the marketplace as "share class" differentiation. Investment providers offer the same product in multiple shares classes, where the only difference between them is the total fee. Extra fees are added to each class in order to extract additional revenue to pay intermediaries such as plan recordkeepers and brokers. *See also* Paragraph 121, *infra*.

[42] Revenue sharing is criticized for its tendency to distribute the cost of administrative services unequally among participants and for being more challenging for fiduciaries to monitor than fixed fees. *See* Greg Iacurci, *You might be subsidizing a colleague's 401(k) fees*, CNBC.com (Mar. 1, 2022), *available at* https://www.cnbc.com/2022/03/01/you-might-be-subsidizing-a-colleagues-401k-fees.html.

[43] In prior litigation, Principal showed that many plans had an express 0.65% "Recordkeeping deduct" withdrawn from their guaranteed account balances to pay for administrative services, in addition to the 0.30% pre-bill credit. *See Rozo*, 2021 WL 1837539, at *7–*8.

121.    Given Principal's pricing practices and disclosures, a prudent fiduciary of a plan subscribed to Principal's FSA program must make a diligent inquiry regarding all available revenue credits and revenue sharing payments. A prudent fiduciary must further monitor the marketplace to understand the fees paid by other plans for similar administrative services. If the value of revenue credits and revenue sharing payments exceeds the market cost of similar services, a prudent fiduciary must conduct an RFI or RFP to explore competing offers and negotiate with Principal to ensure that participants receive Principal's best offer.

122.    Garnet failed to act prudently in monitoring Principal's compensation. With the Plan quadrupling in assets and the market for retirement plan servicing becoming more cost-effective with each passing year (*see* Paragraphs 59–61, *supra*), Garnet had to demand repricing from Principal and to explore competing offers from other administrative service providers. However, there is no evidence that Garnet engaged in any prudent measures to reduce participants' fees. Substantial fee reductions and rebates—expected based on the Plan's growth—have not been realized. The Plan received a rebate for exceeding Principal's billed rate in only one of the last six years (in 2022), and Plan continues to invest in high-cost share classes of investment funds that pay revenue sharing to Principal at the same rates as those paid nearly 15 years ago.[44] This record reflects deference to Principal and a failure to exert independence to capture available fee savings for participants.

---

[44] For example, the Plan continues to hold the "R4" share class of the American Funds EuroPacific Growth Fund, which costs 0.35% more than the lowest cost and otherwise identical "R6" class. The difference is paid to Principal for administrative services.

123.    Important details are not disclosed to Plan participants and must be inferred. Participants are told only that their administrative fees are covered through their investments. The billed rate is known only to Garnet and Principal, and pre-bill discounts may be known only to Principal, or both Principal and Garnet.

124.    Nonetheless, the terms of comparable arrangements involving the same and similar products and parties provide a reasonable guide. Based on reasonable inferences, the Plan's current pricing appears is wildly out of scale with the marketplace—a consequence of allowing pricing built for a much smaller plan to run unchecked.

125.    First, the Plan's investment in the PFIGO is worth between 0.25% and 0.30% in pre-bill credits under Principal's pricing system, or around $53 to $63 per participant at the Plan's current size. Principal's disclosures to PFIGO investors are clear that Principal continues to reduce its top line administrative services pricing if plans invest in the PFIGO, the same as it did for the PFIGO's predecessor product.[45] The specific discount rate does not appear to have been revealed publicly. It is reasonable to infer that the PFIGO credit is worth between 0.25% and 0.30% of assets invested in the PFIGO. The lower 0.25% figure is the express rate of revenue sharing that Principal currently pays on balances in PFIGO's sister product that is offered in plans administered by other firms, such as Fidelity. The PFIGO's sister product has credited higher rates than the PFIGO in recent years and still gives 0.25% back for plan administration. This implies that the 0.25% is not achieved by reducing the

---

[45] *See* note 37, *supra.*

crediting rate and instead is functionally equivalent to the pre-bill credit that Principal applies when FSA plans invest in the PFIGO. The 0.30% figure is the credit that Principal gave for assets in the PFIGO's predecessor FSA product, as revealed in prior litigation.[46]

126.    Second, the Plan's use of the RetireView service is worth 0.05% of the Plan's entire asset base in administrative services fee credit, or around $39 per participant at the Plan's current size. This rate is equal to the top line discount that Principal has advertised to other RetireView users.[47]

127.    Third, Principal receives additional revenue sharing payments that are drawn from the Plan's assets because Garnet continues to invest in higher cost shares of many Plan investment funds. These rates vary by fund and range between 0.05% and 0.39%. The weighted average is around 0.10% of the Plan's total asset base, or around $76 per participant at the Plan's current size.

128.    Based on the forgoing, the sum of all revenue credits and revenue sharing payments available to the Plan is equal to around 0.21% to 0.23% of the Plan's total asset base, or around $168 to $178 per participant at the Plan's current size. The Plan's pricing of 0.21% to 0.23% equaled around $96 to $102 per participant when the Plan first subscribed to Principal. Accordingly, the Plan's administrative costs have increased by around 75% on a per participant basis since 2010.

---

[46] *See id.*

[47] The fact that Principal *pays* customers to use the RetireView service is a strong indicator that the service does not add value to the Plan, but instead serves the interests of the Plan's service providers.

129.    This is not how the market for administrative services works for plans that are prudently managed. *Per capita* administrative costs in prudently managed plans come down as the plan grows. But when administrative fees are assessed as a percentage of assets and the asset-based charges are not adequately monitored, the costs will naturally rise as the plan grows—the exact opposite of what happens in prudently managed plans as economies of scale improve.

130.    It is not imprudent to use asset-based charges to draw fees from defined contribution plans. Prudent fiduciaries, however, monitor asset-based rates by the cost per participant. The cost of providing administrative service to a plan is largely a function of the number of participants, and it is standard in the industry to benchmark administrative fees according to the cost per participant. In order to control asset-based charges if assets grow disproportionately to the number of participants, prudent fiduciaries reduce the asset-based rate to maintain a reasonable cost per participant.

131.    The Plan's rate of $96 to $102 per participant in 2010 should be around $69 to $73 per participant now, using the Plan's growth and industry-wide pricing declines as the guide.[48] The adjusted rate of $69 to $73 would correspond to an asset-based rate of around 0.09% at the Plan's current size.

132.    Review of current pricing for similar plans confirms that this adjustment from the Plan's 2010 rates is consistent with the current marketplace. Among all ERISA-governed 403(b) plans with between 2,866 and 3,866 participants

---

[48] *See* Paragraph 61, *supra*.

(*i.e.*, plan within 500 participants of the Plan as of year-end 2022) and between $146 million and $346 million in assets (*i.e.*, plan within $100 million of the Plan as of year-end 2022), current administrative fee information for six plans is publicly available.[49] Each plan charges level (*i.e.*, the same for every participant) asset-based fees for administrative services. When measured on a per-participant basis, the range is $48 to $91 per participant, as shown in the following table.[50] The average is $72 per participant.

| Plan | Plan Assets (in $ Mn) | Participants | Admin Fee Rate | Admin Fees Per Participant |
|------|------|------|------|------|
| AltaMed Health | 165.9 | 3,398 | 0.165% | $81 |
| Azusa Pacific Univ. | 268.1 | 3,403 | 0.115% | $91 |
| Concord Hospital | 193.8 | 3,246 | 0.080% | $48 |
| National Jewish Health | 294.8 | 3,791 | 0.110% | $86 |
| CUNY Research Fd. | 179.6 | 3,422 | 0.125% | $66 |
| Touro Univ. | 342.6 | 2,985 | 0.055% | $63 |

133. Had Garnet prudently monitored the revenue credits and revenue sharing available to the Plan, there are several means by which Garnet could have reduced participants' fees.

---

[49] There are 40 such plans in total. Current participant fee disclosures with sufficient information to determine the rate charged is publicly available for six of the 40 plans.

[50] The scope of services is also comparable. Services included in the Plan's rate are "recordkeeping, participant website access, participant statements, Plan compliance services and financial professional services." The same scope of services—and more—is included in comparable plan rates. For example, National Jewish Health's 0.11% rate ($86 per participant) includes "recordkeeping, legal, accounting, consulting, investment advisory and other plan administration services." It also includes an asset allocation service comparable to RetireView, called "RetirePlus Pro," at no extra charge, and administration of a brokerage platform to access investments outside the plan lineup (which Principal's service to the Plan and rate do not include).

134.    First, the accumulation of more than $70 million in the PFIGO using RetireView meant that the administrative fee credits available to the Plan under Principal's FSA pricing program exceeded the market cost of administrative services for the Plan.[51] Any additional fees collected through revenue sharing were excessive. Accordingly, a prudent fiduciary would have insisted that the Plan switch to the lowest-cost shares classes of all investment funds in the Plan, which would have eliminated revenue sharing and passed the savings on to participants. This would save participants more than $250,000 per year.

| Fund Name | Plan's Share Class | Plan ER | Lower Share Class | Lower Share Class ER | Available Savings |
|---|---|---|---|---|---|
| American Funds EuroPacific Growth | R4 | 0.82% | R6 | 0.47% | 0.35% |
| Calvert US Large Cap Core Responsible Index | I | 0.24% | R6 | 0.19% | 0.05% |
| Invesco Developing Markets | Y | 0.99% | R6 | 0.84% | 0.15% |
| Janus Henderson Mid Cap Value | I | 0.69% | N | 0.59% | 0.10% |
| Loomis Sayles Investment Grade Bond | Y | 0.51% | N | 0.46% | 0.05% |
| PIMCO Real Return Administrative Fund | Admin | 0.92% | I | 0.67% | 0.25% |
| Pioneer Select Mid Cap Growth | A | 1.02% | K | 0.66% | 0.36% |
| Principal Capital Appreciation R5 Fund | R5 | 0.73% | Inst. | 0.48% | 0.25% |
| Principal Equity Income R5 Fund | R5 | 0.77% | Inst | 0.52% | 0.25% |
| Principal High Yield Fund | A | 0.92% | R6 | 0.53% | 0.40% |
| Principal Real Estate Securities | R5 | 1.07% | R6 | 0.81% | 0.25% |
| Principal Strategic Asset Management Balanced Portfolio | R5 | 1.13% | Inst | 0.84% | 0.29% |
| Principal Large Cap Growth | R5 | 0.85% | R6 | 0.59% | 0.26% |

135.    Second, a prudent fiduciary would have negotiated a more favorable deal, with either Principal or another provider. Among similar plans, TIAA and Fidelity are the most commonly used recordkeepers. Both TIAA and Fidelity offer competitive pricing and transparent terms. For example, TIAA offers a pricing model that calculates a levelized rate for the plan as a whole and then automatically credits

---

[51] *See* Paragraphs 112–13, *supra.*

back to participants any revenue sharing or credits in excess of the levelized rate. Had Garnet switched to this model, the Plan would have paid no more than 0.09% of the balance of each fund toward administrative costs and received rebates of revenue sharing and credits in excess of 0.09%, including a 0.06% credit on balances transitioned to the superior RC Plus (*see* Paragraphs 75, 76, *supra*) which has a built-in credit of 0.15%, further increasing the superior yields of this superior alternative. Garnet also could have negotiated a similar deal and rebates with Fidelity or Principal, had it made the effort to do so.

136.    While there are multiple routes a prudent fiduciary in Garnet's position could have taken, one thing is clear: a prudent fiduciary would not have allowed Principal and the Plan's broker to continue to collect revenue sharing payments when the Plan's revenue credits exceeded the fair cost of their services.

## VII.    Garnet Fails to Monitor Individual Transaction Fees.

137.    Garnet also gave Principal permission *carte blanche* to charge participants transaction fees that are not charged in the relevant market. For example, Principal charges Plan participants an automatic base fee of $50 for every withdrawal from their account, in addition to fees for expedited delivery methods (*i.e.*, wire transfer fees, overnight check fees). Other providers serving large plans such as TIAA, Fidelity, and Empower do not typically charge base distribution fees and only charge fees for expedited delivery (which are the same as Principal's expedited delivery fees). Processing ordinary distributions is highly automated and appropriately wrapped into overall administrative services fees. The distribution charge is excessive in relation to the value of the service provided. Garnet has allowed

51

Principal to charge these extra fees without any inquiry into market practices, to the detriment of Plan participants.

## VIII.  The Plan Suffers Total Losses in Excess of $12 Million

138.   Over the statutory period, the Plan has accumulated in excess of $12 million in losses—the difference in the value of the Plan's assets compared to their value assuming Garnet had acted prudently in monitoring the Plan's investments and administrative service providers.

139.   There were three sources of losses: (i) the below market crediting rates of the PFIGO; (ii) administrative fees—the excessive cost of the Plan's administrative services; and, (iii) proprietary mutual fund investment losses—the excessive fees of the Plan's proprietary index funds and the underperformance of two of the Plan's actively managed funds.

140.   The Restatement (Third) of Trusts "specifically identifies as an appropriate comparator for loss calculation purposes 'return rates of one or more . . . suitable index mutual funds or market indexes (with such adjustments as may be appropriate).'" *Brotherston v. Putnam*, 907 F.3d 17, 31 (1st Cir. 2018) (quoting Restatement (Third) of Trusts, § 100 cmt. b (1)). Comparisons to index fund alternatives are well-grounded in the law and academic literature. *See* Restatement (Third) of Trusts § 100 cmt. b(1) (explaining that one acceptable method for measuring damages to a trust is to compare the returns of "imprudent or otherwise improper investments" to "return rates of . . . suitable index mutual funds or market indexes"); William F. Sharpe, The Arithmetic of Active Management, Fin. Analysts J., Jan.–Feb. 1991, at 8 ("The best way to measure a manager's performance is to

compare his or her return with that of a comparable passive alternative."). Index funds serve as proxies for market benchmarks and are superior to simple comparisons to the benchmark index itself because they reflect the cost of "buying in" to the market. Robert C. Jones & Russ Wermers, *Active Management in Mostly Efficient Markets*, Fin. Analysts J., Nov.–Dec. 2011, at 31 ("[T]he relevant comparison is to the passive alternative and not to the index itself.").

141. Attached as **Schedule A** is Plaintiffs' benchmark list which provides the following for each of the Plan's investment options: (i) Plan fund name; (ii) ticker; (iii) benchmark name; (iv) comparator product name; (v) ticker; and, (vi) fund assets by year.

142. In estimating the loss from the PFIGO's below market crediting rates, Plaintiffs assume the replacement of the PFIGO with the RC Plus stable value fund discussed in paragraphs 73 to 77 above.

143. In estimating the loss from excessive administrative fees, Plaintiffs compare the actual cost of the Plan's administrative fees to the 9 bps estimate discussed in paragraph 131 above.

144. With regard to investment losses associated with proprietary Principal funds, Plaintiffs compared the performance of the Principal fund to those index funds identified in Schedule A. *See Brotherston*, 907 F.3d at 32.[52]

---

[52] Two of the proprietary Principal funds have outperformed their benchmark during the statutory period. Plaintiffs do not maintain that retention of these funds was imprudent. However, they were included in the measurement based on the trust law principle that the breaching party is entitled to a reduction in damages for any profits the beneficiaries received attributable to the breaching conduct. Restatement of Trusts (Third) § 101 (2012); *see also Peters v. Aetna, Inc.*, 2 F.4th 199, 224 (4th Cir. 2021).

145.    Plaintiffs estimated contributions and withdrawals from the Plan based upon the Plan's Form 5500 filings.

146.    The Plan's performance was calculated on an asset-weighted basis using asset values from the Plan's Form 5500 filings, with an allowance for contributions and withdrawals and reasonable administrative fees.[53]

147.    The Plan's losses from January 1, 2019 to December 31, 2023[54] are shown in the following figure, which compares the value of the Plan's assets with the value the Plan's assets would have had assuming the replacement of the PFIGO, reasonable administrative expenses, and the replacement of the challenged Principal funds.



---

[53] The Plan assets examined and totaled in this exercise are the assets that comprise the Plan's current menu of investment options. Excluded are legacy assets associated with individual employee annuity contracts that pre-date 2007 regulations that enlarged the employer's role concerning 403(b) investments. The legacy assets total less than $5 million and are no longer receiving contributions.

[54] The estimate of the resulting loss will be updated to include the full statutory period (including the last four months of 2018, and 2024 and beyond) as additional information regarding monthly and quarterly performance of the Plan becomes available.

148.    Participants' total **losses** during the statutory period as a result of Garnet's imprudence were in excess of $12 million through year's end 2023.

149.    Participants' losses continue to accrue and to compound at the rate their investments would have earned had they been prudently invested.

## PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANT'S FIDUCIARY BREACHES

150.    Plaintiffs did not have knowledge of all material facts (including, among other things, the crediting rates paid by comparable stable value products available to the Plan; the fees and performance of comparable index funds available to the Plan; the performance histories and fees of comparable active funds available to the Plan; Principal's pricing practices and the revenue credits and revenue sharing available to the Plan; the availability of lower cost versions of the Plan's investments, and the rates paid by comparable plans for administrative services) until shortly before this suit was filed.

151.    Further, Plaintiffs did not have actual knowledge of the specifics of Defendant's decision-making and monitoring processes with respect to the Plan because this information is solely within the possession of Defendant prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the investigation of counsel and the facts set forth above.

## CLASS ACTION ALLEGATIONS

152.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to seek the remedies provided by 29

U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes any participant or beneficiary to bring suit for injunctive or other equitable relief. Plaintiffs seek certification of this action as a class action pursuant to these statutory provisions and Fed. R. Civ. P. 23.

153.    Plaintiffs assert their claims against Defendant on behalf of a class of participants and beneficiaries of the Plan defined as follows:[16]

> All participants and beneficiaries of the Plan since the date that is six years prior to the date that this action was filed, excluding Garnet and any officers of Garnet with fiduciary responsibility for the Plan's investment or administrative functions.

154.    <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Plan has thousands of participants.

155.    <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Plaintiffs participated in the Plan, were subject to the same fees as other Class members, and were offered the same investment menu as other Class members. Defendant managed the Plan uniformly and treated Plaintiffs consistently with other Class members. Defendant's imprudent actions and omissions affected all Class members similarly.

156.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

157. <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

A. Whether Defendant is a fiduciary of the Plan, and the scope of its fiduciary duties;

B. Whether Defendant breached its fiduciary duties under 29 U.S.C. § 1104 by engaging in the acts and omissions described herein;

C. Whether Defendant's fiduciary breaches caused losses to the Plan;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

158. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendant would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

159. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as replacement of investments or service providers or removal of Plan fiduciaries, would be dispositive of non-party participants' interests. The restoration of assets of the

Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

160.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendant by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I

161.    Plaintiffs adopt by reference the forgoing factual allegations.

162.    Defendant breached its fiduciary duties in connection with its selection, retention, and monitoring of the Plan's investment options. It did the same with respect to the Plan's administrative expenses.

58

163.    Defendant's fiduciary duties included managing the Plan's assets for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable excess expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA.

164.    Defendant is responsible for ensuring that the Plan's fees are reasonable, evaluating and monitoring the Plan's investments on an ongoing basis and removing and replacing imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. In order to do so, Defendant had to have a viable, documented process and methodology for monitoring the Plan's investment and expenses.

165.    As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble I*, 575 U.S. at 529.

166.    Defendant failed to implement a prudent process for selecting, retaining, or monitoring the Plan's investment options. Defendant acquiesced to the Plan's recordkeeper and failed to interrogate or scrutinize Principal's proprietary investment options, even as the Plan ballooned in growth and acquired even greater bargaining power in the marketplace.

167.    Defendant likewise allowed the Plan's administrative expenses to balloon, causing the Plan to pay excessive administrative expenses to Principal and the Plan's broker.

168.    Defendant is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

169.    The Plan, Plaintiffs, and members of the putative class suffered losses resulting from the foregoing fiduciary breaches of Defendant Garnet.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendant has breached its fiduciary duties under ERISA;

D.    An order compelling Defendant to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to its position but for this unlawful conduct;

E.    An order enjoining Defendant from any further violations of its ERISA fiduciary responsibilities, obligations, and duties;

F.    Other equitable relief to redress Defendant's illegal practices and to enforce the provisions of ERISA as may be appropriate;

G.    An award of pre-judgment interest;

H.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

I.      An award of such other and further relief as the Court deems equitable and just.

Dated: December 13, 2024              **ENGSTROM LEE LLC**

<u>/s/Jennifer K. Lee</u>
Jennifer K. Lee, NY Bar No. 4876272*
Carl F. Engstrom, MN Bar No. 396298**
323 N. Washington Avenue, Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
jlee@engstromlee.com
cengstrom@engstromlee.com

**JAMES WHITE FIRM LLC**

James H. White IV, AL Bar No. 3611I58J **
2100 Morris Avenue
Birmingham, AL 35203
Telephone: (205) 317-2551
james@whitefirmllc.com

*Admitted in S.D.N.Y.
**Admitted *Pro Hac Vice*