**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

| | |
|---|---|
| JUSTIN GEORGE, ARIENNE PATZELT, MELISSA ZUBER, and TSU HAN POH-GRACIA, as representatives of a class of similarly situated persons, and on behalf of the Garnet Health Medical Center 403(b) Retirement Savings Plan and Garnet Health Medical Center – Catskills 403(b) Retirement Savings Plan<br><br>       Plaintiffs,<br><br>v.<br><br>GARNET HEALTH MEDICAL CENTER,<br>       Defendant. | Case No. 7:24-cv-6422-PMH<br><br>**<u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT</u>** |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND.......................................................... 2

    I.   The Plan. ............................................................................................... 2

    II.  Investment Options. ............................................................................. 2

    III.  Recordkeeping. .................................................................................... 3

    IV.  Plaintiffs' Allegations. ........................................................................ 4

        A.   Administrative Fee Claim. ..................................................... 5

        B.   Index Fund Claim. ................................................................. 6

        C.   Active Fund Performance Claim. ........................................... 8

        D.   Stable Value Fund Claim. ...................................................... 9

LEGAL STANDARDS ................................................................................................ 9

    I.    Motions to Dismiss under Federal Rule of Civil Procedure 12(b)(6)............................. 9

    II.   Evaluation of ERISA Claims .......................................................... 10

    III.  Consideration of Documents at the Pleadings Phase. ....................... 11

ARGUMENT .............................................................................................................. 12

    I.    Plaintiffs' Administrative Fee Claim Fails. ..................................... 12

        A.   Plaintiffs Fail to Specifically Allege the Services Received by the Plan or the Purported Comparators. ................................................................... 12

        B.   Plaintiffs Improperly Inflate Principal's "Revenue Streams" and Compare Them to Uninflated Comparator Plan Fees. ...................................... 14

        C.   Plaintiffs' Allegations About Competitive Bidding Do Not Establish Imprudence..... 17

    II.   Plaintiffs' Imprudent Investment Claim Fails Because the FAC Fails to Plausibly Allege Meaningful Benchmarks for the Plan's Investment Options. ................................. 18

        A.   Plaintiffs Fail to Identify Meaningful Benchmarks for the Plan's Actively Managed Funds. ....................................................................... 18

        B.   Plaintiffs Fail to Identify Meaningful Benchmarks for the Plan's Index Funds........... 23

        C.   Plaintiffs Fail to Identify Meaningful Benchmarks for the PFIGO. ............................. 24

CONCLUSION.......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.*,
47 F.4th 570 (7th Cir. 2022) ...........................................................................13, 20

*In re Am. Express Co. ERISA Litig.*,
762 F. Supp. 2d 614 (S.D.N.Y. 2010)...................................................................12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).........................................................................................10, 26

*Barrett v. O'Reilly Auto., Inc.*,
112 F.4th 1135 (8th Cir. 2024) ............................................................................13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 .........................................................................................................10

*Boyette v. Montefiore Med. Ctr.*,
No. 22-cv-5280 (JGK), 2023 U.S. Dist. LEXIS 203442 (S.D.N.Y. Nov. 13,
2023) ............................................................................................................... *passim*

*Boyette v. Montefiore Med. Ctr.*,
No. 24-1279-cv, 2025 U.S. App. LEXIS 391 (2d Cir. Jan. 8, 2025)...........11, 13, 14

*Cunningham v. USI Ins. Servs., LLC*,
2022 U.S. Dist. LEXIS 54392 (S.D.N.Y. Mar. 25, 2022) ................................11, 16

*Cunningham v. USI Ins. Servs., LLC*,
No. 21-1819 (NSR), 2023 U.S. Dist. LEXIS 220905 (S.D.N.Y. Dec. 11, 2023).............13, 14

*Cutrone v. AllState Corp.*,
No. 1:20-cv-06463 ................................................................................................24

*Davis v. Salesforce.com, Inc.*,
2022 U.S. App. LEXIS 9527 (9th Cir. Apr. 8, 2022) ...........................................20

*Davis v. Wash. Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ......................................................................... *passim*

*Falberg v. Goldman Sachs Grp., Inc.*,
No. 19 Civ. 9910 (ER), 2020 U.S. Dist. LEXIS 121457 (S.D.N.Y. July 9,
2020) ....................................................................................................................21

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
No. 17-6685 (ALC), 2019 U.S. Dist. LEXIS 160112 (S.D.N.Y. Sep. 18, 2019)...................18

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014)..................................................................................10, 11

*Hughes v. Nw. Univ.*,
  142 S. Ct. 737 (2022)......................................................................................10

*Humphries v. Mitsubishi Chem. Am., Inc.*,
  No. 1:23-cv-06214 (JLR), 2024 U.S. Dist. LEXIS 204113 (S.D.N.Y. Nov. 7,
  2024) ...................................................................................................................4

*Matney v. Barrick Gold of N. Am.*,
  80 F.4th 1136 (10th Cir. 2023) .................................................................20, 23

*Matousek v. MidAmerican Energy Co.*,
  51 F.4th 274 (8th Cir. 2022) ............................................................................16

*McCaffree Fin. Corp. v. ADP, Inc.*,
  Civil Action No. 20-5492 (ES) (JRA), 2023 U.S. Dist. LEXIS 56362 (D.N.J.
  Mar. 31, 2023).................................................................................................23

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) .................................................................. *passim*

*Munt v. Wec Energy Grp., Inc.*,
  728 F. Supp. 3d 957 (E.D. Wis. Mar. 29, 2024) ..............................................12

*In re Omnicom ERISA Litig.*,
  No. 20-cv-4141 (CM), 2021 U.S. Dist. LEXIS 144054 (S.D.N.Y. Aug. 2,
  2021) ...............................................................................................................3, 4

*Parmer v. Land O'Lakes, Inc.*,
  518 F. Supp. 3d 1293 (D. Minn. 2021) .............................................................23

*Patterson v. Stanley*,
  No. 16-cv-6568 (RJS), 2019 U.S. Dist. LEXIS 174832 (S.D.N.Y. Oct. 7,
  2019)
  ....................................................................................................11, 19, 20, 23

*In re Prime Healthcare ERISA Litig.*,
  No. 8:20-cv-01529-JLS-JDE, 2021 U.S. Dist. LEXIS 138132 (C.D. Cal. July
  16, 2021) ..........................................................................................................12

*Riley v. Olin Corp.*,
  No. 4:21-cv-01328-SRC, 2022 U.S. Dist. LEXIS 109423 (E.D. Mo. June 21,
  2022) ................................................................................................................23

*Rosenkranz v. Altru Health Sys.*,
  No. 3:20-cv-168, 2021 U.S. Dist. LEXIS 237791 (D.N.D. Dec. 10, 2021) ..........................23

*Rozo v. Principal Life Ins. Co.*,
    2021 WL 1837539 (S.D. Iowa Apr. 8, 2021) ...................................................15, 16

*Ruilova v. Yale-New Haven Hosp., Inc.*,
    No. 3:22-cv-00111-MPS, 2023 U.S. Dist. LEXIS 33791 (D. Conn. Mar. 1,
    2023) ...................................................................................................................21

*Sandoval v. Exela Enter. Sols.*,
    No. 3:17cv1573 (DJS), 2020 U.S. Dist. LEXIS 253226 (D. Conn. Mar. 30,
    2020) ...................................................................................................................26

*Singh v. Deloitte LLP*,
    123 F.4th 88 (2d Cir. 2024) .................................................................... *passim*

*Singh v. Deloitte LLP*,
    650 F. Supp. 3d 259 (S.D.N.Y. 2023)....................................................... *passim*

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004).....................................................................................12

*Smith v. CommonSpirit Health*,
    37 F.4th 1160 (6th Cir. 2022) .................................................................. *passim*

*Tulczynska v. Queens Hosp. Ctr.*,
    No. 17 Civ. 1669 (DAB), 2019 U.S. Dist. LEXIS 23751 (S.D.N.Y. Feb. 12,
    2019) ...................................................................................................................12

*Wehner v. Genentech, Inc.*,
    No. 20-cv-06894-WHO, 2021 U.S. Dist. LEXIS 26227 (N.D. Cal. Feb. 9,
    2021) ...............................................................................................................15, 23

**Other Authorities**

Federal Rules of Civil Procedure Rule 12(b)(6) ......................................................1, 10

Defendant, Garnet Health Medical Center ("Garnet"), through its counsel, hereby submits the following Memorandum in Support of Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint ("FAC") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This is a putative class action asserted by four former Garnet employees who claim Garnet breached its fiduciary duties to participants of the Garnet Health Medical Center 403(b) Retirement Savings Plan (the "Garnet Plan") and the Garnet Health Medical Center - Catskills 403(b) Retirement Savings Plan (the "Catskills Plan") under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* ("ERISA") by retaining certain overpriced and/or underperforming investments in the Plan and failing to monitor and control the Plan's recordkeeping costs. Plaintiffs' claim must be dismissed because their allegations are not sufficient to state a plausible claim for breach of ERISA's duty of prudence.

Plaintiffs' challenges related to recordkeeping fees paid to their recordkeeper, Principal, lack a factual basis and are not supported by the meaningful benchmarks required for ERISA fiduciary breach claims. Plaintiffs estimate Principal's compensation by conflating multiple, speculative sources of revenue for the Plan's recordkeeper. Plaintiffs then compare this value against the fees paid by other plans for recordkeeping services in a single year that are not "estimated" in the same way as the Plan's fees. And they make these comparisons without accounting for the structure of the comparator plans, the providers of the services, or the type or quality of services they received. Such comparisons cannot support a plausible claim of imprudence.

Plaintiffs likewise fail to provide meaningful benchmarks for the Plan's investments. Throughout the FAC, Plaintiffs compare the Plan's investment decisions against those of enigmatic "peer groups" without offering any identifying information to demonstrate the validity

of these comparisons.  Even where Plaintiffs allege more direct comparisons for certain Plan investments, they do so without regard for the nature of the alternative investments or their availability to the Plan during the putative class period.  At bottom, all the FAC does is show that a handful of other investments were offered on the market, but that is not a viable basis for a fiduciary breach claim.  As such, Plaintiffs create no plausible inference that Defendants' decision-making process was flawed.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### I.    The Plan.

Prior to 2021, the Plan consisted of two plans, the Garnet Plan and the Catskills Plan.  FAC, ECF No. 32 at ¶ 19 (citations to the FAC hereinafter denoted as "¶ __").  In 2021, the Garnet Plan and the Catskills Plan were merged leaving the Garnet Plan as the surviving plan (referred to herein as the "Plan").  *Id.*  At all times during the putative class period,[2] the Garnet Plan, Catskills Plan, and the now-merged Plan, operated as tax-qualified 403(b) defined contribution plans.  ¶¶ 20-21.  In a defined contribution plan, participants' retirement benefits are commensurate with the value of their individual accounts, which are comprised of employee and employer contributions plus any investment gains and less investment and administrative expenses.  ¶¶ 22-23.  Participants direct the investment of their account balances into investments of their choosing from the Plan's menu of investment options.  *Id*.

### II.    Investment Options.

The Plan offers a broad range of investment options, including both actively managed mutual funds, passively managed index mutual funds, and a stable value fund.  *See* FAC, Schedule

---

[1] Defendants take Plaintiffs' allegations as true for the purposes of this Motion only.

[2] Plaintiffs allege a putative class of participants and beneficiaries of the Plan spanning "six years prior to the date that this action was filed," which places the start of the putative class period on August 26, 2018.  ¶ 153.

A.  Actively managed funds are comprised of a portfolio of underlying investments that are designed to follow a specific mandate, and that are managed by professional investment managers who aim to achieve gains that outpace the market.  *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020).  Passively managed index funds, in contrast, simply aim to mimic a specific market index, and thus require little management by the investment manager and typically cost less to manage.  *Id.*; ¶ 82.  Many investment firms offer index funds tracking various benchmarks.  ¶ 85.

Fund managers charge fees to investors, which are expressed as a percentage of the participant's holdings, known as an "expense ratio."  *Singh v. Deloitte LLP,* 650 F. Supp. 3d 259, 263 (S.D.N.Y. 2023).  An investment fund's "expense ratio" is typically expressed in basis points, with one basis point equaling 0.01% (0.001 in decimal form).  *See In re Omnicom ERISA Litig.*, No. 20-cv-4141 (CM), 2021 U.S. Dist. LEXIS 144054, at *8-10 (S.D.N.Y. Aug. 2, 2021).  For example, a fund with an expense ratio of 0.50%—or 50 basis points—means an investor will pay $5.00 per year for every $1,000.00 invested.

The Plan's stable value fund option, the Principal Fixed Income Guaranteed Option ("PFIGO"), is a general account-backed group annuity contract issued by Principal Life Insurance Company ("Principal").  ¶ 49.  The PFIGO guarantees a minimum return on invested funds but may provide greater returns in any given year depending on the crediting rates announced by Principal semi-annually.  *Id.*  In short, the fund preserves participants' assets and guards against market risks.

## III.  Recordkeeping.

During the putative class period, Principal served as the Plan's recordkeeper.  ¶ 9. Recordkeepers may perform a wide range of services for a plan, including keeping track of the amount of each participant's investments, providing participants with quarterly account

statements, handling plan-level reporting and disclosure requirements, and providing investment educational materials. *See Singh v. Deloitte LLP*, 123 F.4th 88, 91 n.4 (2d Cir. 2024).

In exchange for the recordkeeping services rendered to the Plan, Principal is paid through "revenue sharing," a contractual arrangement that allocates a specified portion of investment revenues to pay for plan services. ¶ 118; *see also Singh*, 123 F.4th at 91. To explain further, investment managers offer different share classes for investments that are priced differently to suit the specific client based on the amount of assets invested as well as the pricing method for the plan's administrative services. *Humphries v. Mitsubishi Chem. Am., Inc.*, No. 1:23-cv-06214 (JLR), 2024 U.S. Dist. LEXIS 204113, at *4 (S.D.N.Y. Nov. 7, 2024). Some share classes have a higher expense ratio because the money used to pay administrative expenses is bundled in with the investment fee. *See Boyette v. Montefiore Med. Ctr.*, No. 22-cv-5280 (JGK), 2023 U.S. Dist. LEXIS 203442, at *18 (S.D.N.Y. Nov. 13, 2023). Said another way, the investment manager retains the same fee across share classes, but in the higher cost share classes, the additional amount collected is passed to other service providers to pay their fees. *Id.* As Plaintiffs admit, this is a common way to pay administrative expenses. ¶ 118 n. 42.

In 2022, the year of focus in the FAC, revenue sharing retained by Principal was contractually capped at 0.07% of Plan assets, or about $58 per participant. Declaration of Lindsey Chopin ("Chopin Decl."), 2022 408(b)(2) Service Provider Disclosure, Ex. G.

## IV. **Plaintiffs' Allegations.**

Plaintiffs filed their original complaint on August 26, 2024. ECF No. 1. The parties exchanged and filed pre-motion letters regarding Defendant's anticipated motion to dismiss in light of pleading deficiencies in the original complaint. ECF Nos., 22, 23. The Court held a telephonic pre-motion conference on November 13, 2024 and ordered that: (i) Plaintiffs were to file any amended complaint by December 13, 2024; (ii) the parties were to meet and confer

regarding the filing of any amended complaint; (iii) by December 31, 2024, Defendant was to file a letter advising the Court whether it would answer the FAC or proceed with a motion to dismiss; and (iv) Plaintiffs would have until January 6, 2025 to respond to Defendant's letter. *See* November 13, 2024 Minute Entry. On Defendant's Motion, the Court extended the deadlines for Defendant's and Plaintiffs' letters to January 7, 2025 and January 14, 2025, respectively. Order (ECF No. 34).

Plaintiffs filed the FAC on December 13, 2024. ECF No. 32. Plaintiffs Justin George, Arienne Patzelt, Melissa Zuber, and Tsu Han Poh-Gracia are former Garnet employees and current—or, in the case of Arienne Patzelt, former—Plan participants who have filed suit on behalf of a purported class of participants and beneficiaries of the Plan from August 26, 2018, through the date of judgment. ¶¶ 25-26, 32-35, 153. The FAC's single count alleging breach of ERISA's duty of prudence captures multiple distinct claims, summarized below. As the parties were unable to resolve disagreements concerning the sufficiency of the amended allegations, Defendant sought leave to file the present Motion, which was granted on January 15, 2025. ECF No. 37.

### A.    Administrative Fee Claim.

The heart of Plaintiffs' administrative fee claim is their purported "estimate" that Plan participants pay Principal around 21 to 23 basis points, or about $168 - $178 per participant, annually for Principal's recordkeeping services. ¶ 128. Plaintiffs reach this "estimate" by adding up speculative "pre-bill credits" and estimated revenue sharing payments. ¶¶ 125 - 128. Specifically, they allege that the Plan's investment in the PFIGO is "worth" $53 - $63 per participant, that the Plan's use of Principal's RetireView allocation product is "worth" around $39 per participant, and that Principal collects an additional $76 per participant in revenue sharing from the Plan's investments. *Id.* None of these estimates come from the Plan's Form 5500s or fee disclosures. Instead, Plaintiffs rely primarily on the factual findings from another ERISA litigation

filed against Principal (in which Principal prevailed).  *See* ¶¶ 62, 117-118 ns.18, 38, 43 (citing *Rozo v. Principal Life Ins. Co.*, 2021 WL 1837539, at *2 (S.D. Iowa Apr. 8, 2021)).

From those estimates, Plaintiffs allege that the Plan's fiduciaries must have failed to prudently monitor Principal's revenue, causing it to become excessive, and causing participants to suffer losses.  ¶¶ 112 - 136.  Specifically, following pages of allegations concerning Principal's general back-of-the-house pricing practices that Plaintiffs admit are confidential and not visible to Plan sponsors like Garnet, Plaintiffs assert that "prudent fiduciar[ies] … must make a diligent inquiry regarding all revenue credits and revenue sharing payments" and "monitor the marketplace to understand the fees paid by other plans for similar administrative services."  ¶ 121.  As to the latter requirement, Plaintiffs assert that requests for proposals or requests for information are required "if the value of revenue credits and revenue sharing payments exceeds the market cost of similar services."  *Id.*  Moreover, Plaintiffs allege that, because the "pre-bill credits" should have been enough to entirely offset Principal's recordkeeping fees, any revenue sharing collected through higher cost share classes of the Plan's investments was excessive.  ¶ 134.[3]

### B.    Index Fund Claim.

Plaintiffs allege that the Plan offered passively managed index funds managed by Principal that could have been replaced with other options available on the market that cost less and tracked their chosen index with greater precision.  ¶¶ 81-94.  Specifically, Plaintiffs allege: (1) Fidelity and Vanguard offered index funds that cost less and performed better than the Principal LargeCap S&P 500 Index Fund; (2) Fidelity, Blackrock, and Vanguard offered index funds that cost less and performed better than the Principal Aggregate Bond Market Index Fund; (3) Northern and

---

[3] Plaintiffs claim that Garnet failed to monitor individual transaction fees charged by Principal to the participants separate and apart from its recordkeeping fees.  The only allegation in support is that Principal charged a $50 fee to make withdrawals.  ¶ 137.  Plaintiffs do not point to any other specific fees and do not allege with any specificity that other recordkeepers do not charge for such fees.  *Id.*

Vanguard offered index funds that cost less and performed better than the Principal MidCap S&P 400 Index Fund; (4) Vanguard offered an index fund that cost less and performed better than the Principal SmallCap S&P 600 Index Fund; and (5) Fidelity and Blackrock offered index funds that cost less and performed better than the Principal International Equity Index Fund . ¶¶ 87, 99, 91, 92, 93.

For each index fund, Plaintiffs also allege the number of "peer plans" offering the Principal fund, as well as the number of "peer plans" offering the allegedly comparable funds. ¶¶ 88, 90, 91, 92, 93. Critically, Plaintiffs' allegations show that 105 of the 349 "peer plans" invest in a large cap index fund other than the Vanguard and Fidelity funds that Plaintiffs propose as alternatives; 90 of the 349 "peer plans" invested in a bond index fund other than the Vanguard, Blackrock, and Fidelity funds Plaintiffs propose as alternatives; and 284 of the 349 "peer plans" invested in an international equity index fund other than the Blackrock and Fidelity funds Plaintiffs propose as alternatives. ¶¶ 88, 90, 93.

Plaintiffs' allegations regarding the prevalence of their comparator funds for the Principal MidCap S&P 400 Index Fund and the Principal Small Cap S&P 600 Index Fund are even murkier. Plaintiffs allege "peer plan" uptake of "*a* Fidelity mid cap index fund (FSDMK)" and "*a* Vanguard mid cap index fund". ¶¶ 91-92 (emphasis added). The listed Fidelity fund does not track the same market index as the Principal fund being challenged,[4] and the alleged Vanguard fund is unnamed, making it unclear whether Plaintiffs refer to the Vanguard fund that tracks the S&P 400 index or skew their allegations by including all Vanguard mid-cap index funds. ¶ 91. In any event, Plaintiff's amalgamated data shows that 181 of the 349 peer plans use a mid-cap index fund other

---

[4]   *Fidelity Mid Cap Index Fund Fact Sheet*, Fidelity, https://fundresearch.fidelity.com/mutual-funds/fundfactpdf/316146265?appcode=RETAIL at 2 (last accessed Feb. 3, 2025) (fund is a diversified domestic mid-cap equity strategy that seeks to closely track the returns and characteristics of the Russell Midcap Index").

than the Vanguard and Fidelity funds Plaintiffs tout.[5]  Similarly, Plaintiffs' data shows that 202 of the 349 peer plans use a small cap index fund offered by managers other than Vanguard and Fidelity.

### C.    Active Fund Performance Claim.

Plaintiffs allege that, of the Plan's six actively mutual funds managed by Principal that were originally selected for the Plan before the putative class period, two of them (the Principal LargeCap Growth Fund I and Principal Strategic Asset Management Balanced Portfolio, R5 Shares) are imprudent investments for the Plan because they "persistently and severely underperformed their benchmarks."  ¶ 95.  In addition, though the Principal Equity Income fund and Principal High Yield fund apparently did not severely underperform, they could have been replaced with "better" options.  ¶ 96.  In support, Plaintiffs compare these four funds' 3-, 5-, and 10-year returns as of December 31, 2021 to a benchmark index, an index fund, and three to four actively managed funds offered by other mangers, depending on the investment.  ¶¶ 101, 103, 105, 109.  Plaintiffs allege for all four funds that "prudent fiduciaries" will replace actively managed funds that are unlikely to beat the index net of fees with passively managed index funds.  *Id.* ¶ 97.

Similar to Plaintiffs' index fund allegations, Plaintiffs allege the number of "peer plans" offering the challenged funds and Plaintiffs' preferred alternative funds.  But, as before, Plaintiffs' alleged data shows that: (1) 219 of the 349 peer plans offered a large cap growth fund other than the options that Plaintiffs point to, (2) 252 of the 349 peer plans offered a balanced fund other than the options that Plaintiffs point to, (3) 283 of the 349 peer plans offered a large cap value fund

---

[5] Notably, Plaintiffs allege that the Northern Mid Cap Index fund outperformed the Principal fund at issue but do not allege how many "peer plans" offered the Northern Mid Cap Index fund. One potential reason for that omission is that, unlike Vanguard and Fidelity who are two top providers found in many plans, the Northern Mid Cap Index fund is likely offered in far fewer plans, meaning that data on peer plan uptake would not support Plaintiffs' theory.

other than the options that Plaintiffs point to, and (4) 292 of the 349 peer plans offered a high yield bond fund other than the options that Plaintiffs point to.  ¶¶ 102, 104, 108, 110.

> ### D.    Stable Value Fund Claim.

Plaintiffs allege that the PFIGO is an "entry-level product" that offered subpar crediting rates not suitable for a plan of the size of the Plan here.  ¶ 67.  Plaintiffs claim that the PFIGO credited between 1.59% and 1.83% during the putative class period, depending on the year, while the TIAA Retirement Choice Plus fund was crediting between 2.80% and 4.05%.  ¶ 76.  Plaintiffs further allege that "peer plans" received average crediting rates between 2.83% and 3.52% without specifying which stable value fund product those plans offered.  *Id.*  Finally, Plaintiffs allege that one other plan, the Norton Healthcare plan, exited the PFIGO in 2019 and entered a custom stable value fund product with about a .70% higher interest rate.  ¶ 78.

## LEGAL STANDARDS

### I.    Motions to Dismiss under Federal Rule of Civil Procedure 12(b)(6)

A complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570(2007).  A "plausible" claim is one supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To determine plausibility, the court begins by stripping out conclusory statements, which are not entitled to a presumption of truth, then evaluating whether the well-pled factual allegations that remain (if any) plausibly give rise to an entitlement to relief.  *See id.* at 679.  A plaintiff who establishes only "conceivable" or "possible" misconduct has not "nudged his claims…across the line" to plausibility.  *Id.*  The *Twombly/Iqbal* pleading standard applies with equal force to ERISA 401(k) class actions, and courts must apply that standard in the context of the applicable substantive law, which in this matter is ERISA.  *See Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022).

## II.    <u>Evaluation of ERISA Claims</u>

The U.S. Supreme Court has held that, in the ERISA context, a motion to dismiss is an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  It has also recognized the wide range of reasonable choices that fiduciaries must make and obliges the courts to do the same in evaluating fiduciary decisions, which necessarily requires a "context specific" inquiry. *Hughes*, 142 S. Ct. at 742; *see also Singh*, 123 F.4th at 93 ("[T]he prudence inquiry is necessarily context specific and 'the circumstances facing an ERISA fiduciary,' often enough, 'will implicate difficult tradeoffs.'") (quoting *Hughes*, 142 S. Ct. at 742).

ERISA imposes a "prudent person" standard by which to measure fiduciary decisions. *Dudenhoeffer*, 573 U.S. at 419.  This prudence standard focuses on the fiduciary's conduct in making a decision, not on the results of that decision, and asks whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular decision. *Cunningham v. USI Ins. Servs., LLC*, 2022 U.S. Dist. LEXIS 54392, at *8 (S.D.N.Y. Mar. 25, 2022); *Singh*, 650 F. Supp. 3d at 266.  Thus, to survive a motion to dismiss, an ERISA plaintiff must allege facts sufficient to raise a plausible inference that the fiduciary's decision-making process was imprudent, not merely that better investments or services existed. *Id.*

To create an inference of imprudence with respect to administrative fees, Plaintiffs must plead a meaningful benchmark against which to evaluate the challenged fees. *Boyette v. Montefiore Med. Ctr.*, No. 24-1279-cv, 2025 U.S. App. LEXIS 391, at *3 (2d Cir. Jan. 8, 2025). This requires Plaintiffs to plausibly plead that *similar plans* paid less for *similar recordkeeping services. Boyette*, 2025 U.S. App. LEXIS 391, at *3; *Singh*, 650 F. Supp. 3d at 267.  Anything less is not an "apples-to-apples" comparison that supports an inference of imprudence. *Id.*

Likewise, to create an inference of imprudence with respect to investments, Plaintiffs must provide meaningful benchmarks in the form of investments with a similar style, structure, and strategy that significantly and persistently outperformed the challenged funds net of fees. *Id.* at 268. Merely identifying cheaper funds, the top-performing funds, or funds that enjoyed brief periods of superior performance is not sufficient. *Id.*; *Boyette*, 2023 U.S. Dist. LEXIS 203442, at \*20; *Patterson v. Stanley*, No. 16-cv-6568 (RJS), 2019 U.S. Dist. LEXIS 174832, at \*32 (S.D.N.Y. Oct. 7, 2019); *see also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (holding that the mere fact Vanguard and Fidelity offered cheaper options does not support a claim of imprudence with respect to investment decisions).

## III.   Consideration of Documents at the Pleadings Phase.

When evaluating a motion to dismiss for failure to state a claim, courts may take into consideration: (1) documents referred to in the complaint, (2) documents and data integral to the claim, even if not appended to the pleading, and (3) documents or information subject to judicial notice. *Tulczynska v. Queens Hosp. Ctr.*, No. 17 Civ. 1669 (DAB), 2019 U.S. Dist. LEXIS 23751, at \*14 (S.D.N.Y. Feb. 12, 2019); *Singh*, 650 F. Supp. 3d at 267 n.3; *see also*, *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (recognizing that the court may consider documents "that, although not incorporated by reference, are 'integral' to the [C]omplaint."); *In re Am. Express Co. ERISA Litig.*, 762 F. Supp. 2d 614, 618 (S.D.N.Y. 2010) (recognizing that the court may consider "documents that the plaintiff[s] relied on in bringing suit and that are either in the plaintiff[s'] possession or that the plaintiff[s] knew of when bringing suit, or matters of which judicial notice may be taken."); *see also Meiners*, 898 F.3d at 823 (explaining that ERISA plaintiffs challenging investments have data at their disposal from which to source facts supporting their claims).

Here, the Court may consider the documents attached to Defendant's motion, which include Form 5500s for the Plan and the comparator plans listed in the FAC and the 2022 408(b)(2)

11

fee disclosure. The former are publicly filed documents, accessible to all, and are explicitly referenced in the FAC. *In re Prime Healthcare ERISA Litig*., No. 8:20-cv-01529-JLS-JDE, 2021 U.S. Dist. LEXIS 138132, at *8 (C.D. Cal. July 16, 2021) ("considering publicly available Form 5500s spanning the putative class period."). The 2022 fee disclosure is the type of document that is frequently considered in these types of cases, and it was in Plaintiffs' possession at the time the FAC was filed. *Munt v. Wec Energy Grp., Inc.*, 728 F. Supp. 3d 957, 974 (E.D. Wis. Mar. 29, 2024) (considering 408(b) disclosures); *In re Prime Healthcare ERISA Litig*., 2021 U.S. Dist. LEXIS 138132, at *8 (considering the plan's annual fee disclosures).

## ARGUMENT

### I.    Plaintiffs' Administrative Fee Claim Fails.

Plaintiffs claim that compensation to the Plan's recordkeeper, Principal, was excessive. The FAC does not plausibly allege this claim, however, as it compares the Plan's fees against those of other plans without addressing the services provided and does not compare the same revenue streams across the identified comparators. ¶ 132. Thus, there are no allegations in the FAC that nudges Plaintiffs' speculation that Garnet failed to monitor the Plan's fees from conceivable to plausible, and their claim must be dismissed.

### A.    Plaintiffs Fail to Specifically Allege the Services Received by the Plan or the Purported Comparators.

The Second Circuit recently made clear that Plaintiffs must allege facts about the scope and quality of recordkeeping services offered to plans used as comparators to establish a fiduciary breach claim based on excessive recordkeeping fees. *Singh,* 123 F.4th 88, 95; *Boyette*, 2025 U.S. App. LEXIS 391, at *4; *accord Barrett v. O'Reilly Auto., Inc.*, 112 F.4th 1135, 1138 (8th Cir. 2024); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 582 (7th Cir. 2022); *Smith v. CommonSpirit Health,*

37 F.4th 1160, 1169 (6th Cir. 2022); *see also Cunningham v. USI Ins. Servs., LLC*, No. 21-1819 (NSR), 2023 U.S. Dist. LEXIS 220905, at *19 (S.D.N.Y. Dec. 11, 2023).

In *Singh*, the Second Circuit affirmed the dismissal of a similar complaint alleging that the plan had imprudently retained its recordkeeper since 2004 without monitoring its fees, leading to recordkeeping fees that were greater than those of six other similarly sized plans, because the complaint did not include specific allegations of the nature and quality of services received by the challenged plan or comparators. *Id.* at 94-98. Instead, the plaintiffs asserted that "nearly all recordkeepers in the marketplace offer the same range of services" and that "numerous recordkeepers in the marketplace are capable of providing a high level of service." *Id.* at 91. But, as the court recognized, cost disparity alone, without additional context, cannot categorically suggest imprudence. *Id.* Indeed, the fact that the purported comparators did not pay identical fees belied the implication that all fees are commoditized and fungible. *Id.* at 94.

In *Boyette*, the Second Circuit reaffirmed the importance of specific service allegations by affirming the dismissal of a complaint that failed to "sufficiently allege 'what level of service the Plan provided [or] whether less expensive comparator plans provided a similar *quality* of service.'" *Boyette*, 2025 U.S. App. LEXIS 391, at *4. Rather than raise detailed allegations of services that would support a meaningful apples-to-apples comparison, the *Boyette* plaintiffs asserted in a conclusory manner that recordkeeping services were "fungible" across providers. *Id.* The Second Circuit held that such a broad allegation could not support a plausible claim, once again noting that "the variation in fees among [the plaintiffs'] own comparator plans contradicts their assertion that such services are standardized." *Id.*

Plaintiffs here, like the plaintiffs in *Singh* and *Boyette*, have eschewed detailed allegations of services in favor of conclusory assertions of fungibility, which requires dismissal of their

Administrative Fee Claim.  Plaintiffs assert in a footnote that "the scope of services [received by the Plan and the purported comparators] is also comparable."  ¶ 132, n. 50.  But Plaintiffs make no specific allegations regarding who the recordkeeper was for each comparator plan, let alone the nature, frequency, quality or complexity of administrative services received by the Plan or its purported comparators.[6]  ¶ 132.

**B.    Plaintiffs Improperly Inflate Principal's "Revenue Streams" and Compare Them to Uninflated Comparator Plan Fees.**

Even setting aside the lack of specific allegations regarding services, Plaintiffs have failed to provide an "apples to apples" comparison of fees.  The FAC combines speculative estimates of the value of the Plan's investment in the PFIGO and use of the Principal RetireView service with the estimated revenue sharing allegedly paid to Principal from the Plan's investments to create an artificial "admin fee rate" for the Plan.  ¶¶ 125-128.  The FAC then compares this "admin fee rate" to the "admin fee rates" of six other plans, without specifying how these values were determined.  ¶ 132.  This creates multiple issues that necessitate dismissal.

*First*, in "estimating" the Plan's fees, it is not proper to consider the "value of pre-bill credits" as compensation to Principal.  These credits are sourced for another lawsuit, *Rozo v. Principal Life Insurance*, and Plaintiffs allege nothing in the FAC allowing the Court to infer that the same credits applied to Garnet.  ¶¶ 125-126.  Indeed, Plaintiffs admit in the FAC that these credits are not "revealed publicly," not disclosed in fee disclosures sent to Plan sponsors, like

---

[6] Plaintiffs' claim that "Garnet also gave Principal permission carte blanche to charge participants transaction fees that are not charged in the relevant market" is similarly lacking.  ¶ 137.  Plaintiffs offer only their unsourced assertion that "other providers servicing large plans such as TIAA, Fidelity, and Empower, do not typically charge base distribution fees and only charge fees for expedited delivery" in support of this claim.  *Id.*  Plaintiffs make no attempt to identify specific plans comparable in size and composition to the Plan that were not charged similar fees for similar services. *See Boyette*, 2025 U.S. App. LEXIS 391, at *3.

Garnet,[7] and actually relate to an entirely different "sister product."  ¶ 125.  And, in any case, Plaintiffs may not rely on findings from other matters to support their allegations in *this* case.  *See, e.g., Wehner v. Genentech, Inc.*, No. 20-cv-06894-WHO, 2021 U.S. Dist. LEXIS 26227, at *19 (N.D. Cal. Feb. 9, 2021) (rejecting as a meaningful comparator a stipulated valuation of recordkeeping services from another lawsuit).

*Even more critically*, however, the pre-bill credits are just that: credits deducted from the pricing model for the plan before it is billed.  It is frankly unclear why Plaintiffs consider these credits to be additional revenue to be added on top of Principal's disclosed recordkeeping rates; they are *reductions* to the Plan's recordkeeping fees that *lower* the participants' total fees.  The very case that Plaintiffs rely on as the source for these credits held that the pre-bill credits discussed in Plaintiffs' complaint were a benefit to participants because they reduced the challenged plan's administrative fees.  *Rozo*, 2021 U.S. Dist. LEXIS 74409 at *21, *26-31 *aff'd*, 48 F.4th 589.

In adding these credits as compensation paid to Principal, Plaintiffs simply ignore the Plan's actual recordkeeping fees despite Garnet having produced Principal's disclosure of fees during the pre-motion conference process.  That disclosure shows that the Plan paid recordkeeping fees contractually capped at 0.07% of Plan assets in 2022 (the year of focus in the Complaint), or about $58 per participant.  Chopin Decl., Ex. G, 2022 408(b)(2).  That is lower than what Plaintiffs allege to be an appropriate asset-based fee based on the Plan's size, and it is in line with the fees alleged for the purported comparator plans.  ¶¶ 131, 132.

*Moreover*, even if Plaintiffs were right to count the "pre-bill credits" as compensation to Principal, it is not appropriate to account for such credits when estimating the fees for the Plan

---

[7] In *Rozo*, the trial court held that such credits need not be disclosed by Principal.  2021 U.S. Dist. LEXIS 74409 at *30, *aff'd* 48 F. 4th 589.

without doing the same for the purported comparators. *See Singh,* 123 F.4th at 95 (affirming dismissal of recordkeeping claim that did not compute the challenged plan's fees and the comparator plan's fees in the same way); *see also Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279-80 (8th Cir. 2022) (same).

That is exactly what Plaintiffs do here. Because Plaintiffs do not explain their sources or methods of calculation for the comparator plans, it is impossible to discern for certain what revenue credits and fees are accounted for in the comparator plan's alleged fees. That on its own is enough to dismiss the claim. *Cunningham*, 2022 U.S. Dist. LEXIS 54392, at *14 (holding that a plaintiff failed to assert a plausible claim because she did not specify how she calculated the indirect fees of the plan and purported comparators).

That said, from the allegations pled, it appears impossible for Plaintiffs to have accounted for pre-bill credits received by the comparator plans.[8]  Plaintiffs explain that they only provided comparisons to peer plans for which they had "current participant fee disclosures with sufficient information to determine the rate charged."  ¶ 132, n. 49.  But just a few pages prior, Plaintiffs alleged that pre-bill credits are not disclosed to participants or recorded in plans' fee disclosures, meaning the participant disclosures did not arm Plaintiffs with the data needed to "estimate" the comparator plans' fees like they did for the Plan.  ¶ 117.  And since none of the comparator plans were recordkept by Principal, Plaintiffs could not have relied on the findings from *Rozo v. Principal Life Insurance* to estimate any credits they may have received.  Chopin Decl., Exs. A-F, 2022 Form 5500 for AltaMed Health, 2022 Form 5500 for Azusa Pacific University, 2022 Form

---

[8] Similarly, two of the comparators, Touro University and National Jewish Health, pay fees to multiple recordkeepers, and it is unclear whether Plaintiffs' comparison accounts for the *total* fees paid by these plans or merely the fees paid to one of two recordkeepers.  Chopin Decl., Exs. A-F, 2022 Form 5500 for AltaMed Health, 2022 Form 5500 for Azusa Pacific University, 2022 Form 5500 for Concord Hospital, 2022 Form 5500 for CUNY Research Foundation, 2022 Form 5500 for Touro University, 2022 Form 5500 for National Jewish Health.

5500 for Concord Hospital, 2022 Form 5500 for CUNY Research Foundation, 2022 Form 5500 for Touro University, 2022 Form 5500 for National Jewish Health.[9]

*Finally*, even if Plaintiffs had accounted for these potential variances, they have offered only one year of comparison to support claims ranging across a six-year putative class period. Such ambiguous, snapshot comparisons cannot support a claim for relief. *See Singh*, 123 F.4th at 88 (holding that comparisons of fees from only a single year within the putative class period that disregarded indirect fees could not support a plausible claim of imprudence).

### C. Plaintiffs' Allegations About Competitive Bidding Do Not Establish Imprudence.

Plaintiffs spend several paragraphs of the Complaint asserting their preferred practices for negotiating fees and speculating about the Plan's fiduciaries' failure to conduct competitive bidding to negotiate fees.  ¶ 65, n. 21, 121, 135.  But "this inference about [the] decision-making process relies on the assumption that the Plan's recordkeeping fees were excessive relative to the services rendered, a proposition that the Plaintiffs have not adequately alleged." *Singh*, 123 F.4th at 96.  And, even setting aside Plaintiffs' failure to plausibly allege that the Plan's fees were excessive, the alleged failure to conduct a request for proposal, on its own, does not show imprudence because "ERISA does not require plan fiduciaries to obtain competitive bids from plan service providers." *Ferguson v. Ruane Cunniff & Goldfarb Inc.,* No. 17-6685 (ALC), 2019 U.S. Dist. LEXIS 160112, at *24 (S.D.N.Y. Sep. 18, 2019).

---

[9] Plaintiffs do not specifically identify the recordkeepers for the comparators in the FAC, but the recordkeepers for each plan are listed in Schedule C of their respective Form 5500 filings.  Chopin Decl., Exs. A-F, 2022 Form 5500 for AltaMed Health, 2022 Form 5500 for Azusa Pacific University, 2022 Form 5500 for Concord Hospital, 2022 Form 5500 for CUNY Research Foundation, 2022 Form 5500 for Touro University, 2022 Form 5500 for National Jewish Health.

## II.  Plaintiffs' Imprudent Investment Claim Fails Because the FAC Fails to Plausibly Allege Meaningful Benchmarks for the Plan's Investment Options.

Plaintiffs claim that some of the Plan's investments were imprudent.  But, as with their administrative fee claim, Plaintiffs have provided no meaningful benchmarks against which the challenged investments can be judged.  Plaintiffs' challenges rely solely on hindsight-based assertions about fund performance and popularity polls, entirely forgoing the sort of analysis necessary to assert a plausible claim.

### A.  Plaintiffs Fail to Identify Meaningful Benchmarks for the Plan's Actively Managed Funds.

Plaintiffs challenge four of the Plan's actively managed investment options: the Principal LargeCap Growth Fund I, Principal Strategic Asset Management Balanced Portfolio, Principal Equity Income, and the Principal High Yield Bond Fund.  ¶¶ 95-111 & Schedule A (ECF No. 32-1).  To substantiate their claim, Plaintiffs allegedly compare the challenged investments to uninvestible market indexes, passively managed funds, and cherry-picked top-performing funds.  But none of these benchmarks support an inference of imprudence because: (1) relative performance compared to a benchmark index does not establish underperformance in the market as a whole, (2) plans need not replace actively managed funds with passively managed index funds, and (3) Plaintiffs' actively managed comparators merely show that other options existed.

#### 1.  Relative Underperformance of a Benchmark Index Is Not a Meaningful Benchmark and Does Not Support a Plausible Inference of Imprudence

Investments underperform.  *Smith,* 37 F.4th at 1167 (noting that mere underperformance does not render a fund an imprudent investment).  Thus, relative underperformance of the investment's benchmark on its own does not support an inference of imprudence, particularly not when focused on only a single snapshot within the alleged putative class period as is the case here. *Boyette*, 2023 U.S. Dist. LEXIS 203442, at *19; *Singh*, 650 F. Supp. 3d at 268-69; *Patterson v.*

*Stanley*, 2019 U.S. Dist. LEXIS 174832, at *32 (S.D.N.Y. Oct. 7, 2019); *see also Smith*, 37 F.4th at 1166 (expressly rejecting the notion "that every actively managed fund with below-average results over the most recent five-year period would create a plausible ERISA violation."); *Davis*, 960 F.3d at 486 ("[F]iduciaries are not required to pick 'the *best* performing fund.'") (emphasis in original) (quoting *Meiners*, 898 F.3d at 823).

Plaintiffs' allegation that two of the Plan's funds "persistently and severely," underperformed their benchmark does not save their claim. ¶ 95. "Although courts in this district have recognized that allegations of consistent, ten-year underperformance may support a duty of prudence claim, [...] the underperformance must be substantial." *Patterson v. Stanley*, No. 16-cv-6568 (RJS), 2019 U.S. Dist. LEXIS 174832, at *31-32 (S.D.N.Y. Oct. 7, 2019). Courts have sustained claims under this theory where a fund's ten-year performance was separated by a "nine-point differential," but that is not the case here. Similar to the claims in *Patterson*, which were dismissed, Plaintiffs allege that the LargeCap Growth Fund, Balanced Fund, and High Yield Bond Fund trailed their benchmarks on a ten-year basis by only .72%, 1.41%, and .91% respectively, as of December 31, 2021. Notably, the one other challenged fund outperformed its benchmark on a 10-year basis. ¶¶105, 107.[10]

---

[10] Publicly available data from Morningstar shows that, in the long-term, the challenged investments stayed on track with or exceeded the median for their category. Performance, Principal LargeCap Growth I R5 (PPUPX), *Morningstar*, https://www.morningstar.com/funds/xnas/ppupx/performance; Performance, Principal SAM Balanced R5 (PSBFX), *Morningstar*, https://www.morningstar.com/funds/xnas/psbfx/performance; Performance, Principal Equity Income R5 (PEIQX), *Morningstar*, https://www.morningstar.com/funds/xnas/peiqx/performance; Performance, Principal High Yield A (CPHYX), *Morningstar*, https://www.morningstar.com/funds/xnas/cphyx/performance.

2.    **Fiduciaries Need Not Replace Actively Managed Funds with Passively Managed Index Funds, So Comparisons Between the Two Are Not Meaningful Benchmarks and Do Not Support a Plausible Inference of Imprudence**

Every circuit to have considered the issue has held that a passively managed fund is not a meaningful benchmark for an actively managed fund due to the fundamental differences in the funds' strategies. *See Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1153-54 (10th Cir. 2023); *Albert*, 47 F.4th at 581-82; *Smith*, 37 F.4th at 1165; *Davis v. Salesforce.Com, Inc.*, 2022 U.S. App. LEXIS 9527, at *5 n.1 (9th Cir. Apr. 8, 2022); *Davis*, 960 F.3d at 485. Accordingly, passively managed index funds are not meaningful benchmarks for actively managed funds, even at the pleadings stage. *Id.* Though the Second Circuit has not had occasion to consider this precise issue, the recent decision in *Singh* indicates it would agree with the circuits who have. *See Singh*, 123 F.4th at 94 ("A court cannot reasonably draw an inference of imprudence simply from the allegation that a cost disparity exists; rather, the complaint must state facts to show the funds or services being compared are, indeed, comparable.") (quoting *Matney*, 80 F.4th at 1149).

An actively managed fund is designed to attempt to beat the market. *Smith*, 37 F.4th at 1165; *Davis*, 960 F.3d at 484; *Ruilova v. Yale-New Haven Hosp., Inc.*, No. 3:22-cv-00111-MPS, 2023 U.S. Dist. LEXIS 33791, at *65 (D. Conn. Mar. 1, 2023); *Falberg v. Goldman Sachs Grp., Inc.*, No. 19 Civ. 9910 (ER), 2020 U.S. Dist. LEXIS 121457, at *4 n.7 (S.D.N.Y. July 9, 2020). Its aims are not comparable to those of a passively managed index fund, thus there is nothing to be gained or learned in comparing the two. *Smith*, 37 F.4th at 1165; *Davis*, 960 F.3d at 484; *Ruilova,* 2023 U.S. Dist. LEXIS 33791, at *42-47. Relatedly, simply because the fund is not beating the index for the snapshot of time presented in the complaint does not render it unsuitable for the Plan. *Id.* As courts have recognized, many investors want the option to invest in actively managed funds and to voluntarily take on the risk that the fund may not achieve that aim. *Id.*

Accordingly, Plaintiffs' comparisons of the four actively managed funds to passive investments, as well as their general criticisms of active investing, does nothing to support their investment underperformance claim.

> ### 3. Plaintiffs' Identification of a Handful of Other Funds Merely Supports the Well-Known Fact That a Range of Reasonable Options Exists and Does Not Support a Plausible Inference that the Plan's Funds Were Unreasonable.

Plaintiffs' listing of three to four other actively managed funds that the Plan could have selected in lieu of the challenged Principal funds, without any discussion of why the comparators are similar other than that they have the same benchmark, does not state a plausible claim.

Courts must "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise. It is not necessarily sufficient to show that better investment opportunities were available at the time of the relevant decisions." *Singh*, 123 F.4th at 93 (internal citations and quotations omitted). Moreover, fiduciaries are not required to chase returns and low fees. *Davis*, 960 F.3d 486. Said another way, fiduciaries need not only offer the top performers. Therefore, simply alleging that other options existed does not support an inference of imprudence. *See Meiners*, 898 F.3d at 823 (holding that the fact Vanguard and Fidelity offered other options does not show imprudence).

That is all the FAC does here. For each challenged fund, Plaintiffs offer either three or four actively managed fund alternatives that are more popular among a "peer group" consisting of 349 unnamed plans with between $146 million and $346 million in assets. FAC, n. 29. For example, to support their claim that the Principal Large CapGrowth Fund I was an imprudent offering, Plaintiffs assert the relative returns of four other large cap growth funds, and allege that,

while a combined 104 "peers" invest in those funds,[11] only eight invested in the Principal Large Cap Growth Fund I.  There are many flaws with these allegations.

*First,* Plaintiffs do not allege why the selected comparators are meaningful benchmarks, other than that they are actively managed funds and have the same prospectus benchmark.  *See, e.g., Smith*, 37 F.4th at 1165 (analyzing the details of active-to-active fund comparisons and affirming dismissal of claims); *Davis*, 960 F.3d at 484 (same).

*Second,* relative underperformance of the comparators tells the court very little about prudence.  *Supra* § II.A.1.  Indeed, all this shows is that, as of December 31, 2021, three other actively managed large cap growth funds posted higher relative returns on a three-, five- and ten-year basis.  It does nothing to put the performance in the context of the market as a whole or for the entire putative class period.  Indeed, even taking the FAC's allegations as true, the three comparators could be ranked the first, second, and third best performing funds in the market at the time.  That the Principal fund fell below that does not create a plausible inference that the fund was imprudent and needed to be jettisoned from the Plan.  *See Patterson v. Stanley*, No. 16-cv-6568 (RJS) 2019 U.S. Dist. LEXIS 174832, at *34 (S.D.N.Y. Oct. 7, 2019) (dismissing claim alleging that a few other mid cap mutual funds had better relative performance because "no court has ever suggested" that plans are "duty-bound" to chase the highest-ranking funds).

*Finally,* Plaintiffs offer no details for the plans in this peer group they draw from, leaving open the question of how comparable any of the plans truly are to the Plan.  Indeed, many courts have dismissed claims resting on aggregated data for precisely this kind of ambiguity.  *See, e.g., Matney*, 80 F.4th at 1155; *McCaffree Fin. Corp. v. ADP, Inc.*, Civil Action No. 20-5492 (ES)

---

[11] 104 peers invested in the actively managed comparators.  Another 24 invested in an index fund tracking the same benchmark.

(JRA), 2023 U.S. Dist. LEXIS 56362, at *47 (D.N.J. Mar. 31, 2023); *Wehner v. Genentech, Inc.*,

No. 20-cv-06894-WHO, 2021 U.S. Dist. LEXIS 26227, at *20-23 (N.D. Cal. Feb. 9, 2021); *Riley*

*v. Olin Corp.*, No. 4:21-cv-01328-SRC, 2022 U.S. Dist. LEXIS 109423, at *16 (E.D. Mo. June 21,

2022); *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1303 (D. Minn. 2021); *Rosenkranz v.*

*Altru Health Sys.*, No. 3:20-cv-168, 2021 U.S. Dist. LEXIS 237791, at *24-25 (D.N.D. Dec. 10,

2021).

       Even putting that uncertainty aside, this data is a red herring.  To begin with, it does not

appear to differentiate between plans selecting active funds and plans selecting passive funds,

which is improper.  *Supra* § II.A.2.  Moreover, that some (even many) of the 349 plans chose the

funds listed in Plaintiffs' chart merely means that the balance of remaining peer plans chose other

investments, but the FAC lacks any allegations to show how the marketplace as a whole is

structured.[12]  At best, Plaintiffs have identified investments that are more popular than others, but

that does not support an ERISA imprudence claim.

      **B.**     **Plaintiffs Fail to Identify Meaningful Benchmarks for the Plan's Index Funds.**

       As with the Plan's active investments, Plaintiffs challenge several of the index funds

offered by the Plan on the basis that they underperformed in comparison to their indexes and were

less popular among the Plan's "peer group" than alternatives in the marketplace.  ¶¶ 81-94.  And,

as with the Plan's active investments, Plaintiffs' allegations are insufficient to support a plausible

claim of imprudence because they amount to little more than identifying cheaper and more popular

funds from but one year of the putative class period.  *Singh*, 650 F. Supp. 3d at 268-69; *Boyette*,

---

[12] That eight plans opted for the Principal Large Cap Growth Fund I actually supports a finding of prudence.  *See*
*Cutrone v. AllState Corp.*, No. 1:20-cv-06463, p. 13 (N.D. Ill. 2025) (rejecting notion that only one prudent option
exists in any given situation).

2023 U.S. Dist. LEXIS 203442, at *20; *see also Meiners*, 898 F.3d at 823 (holding that the fact Vanguard and Fidelity offered other options does not show imprudence); *supra* II.A.1 & II.A.2.

### C.    Plaintiffs Fail to Identify Meaningful Benchmarks for the PFIGO.

The FAC's allegation that Defendant breached its fiduciary duty by retaining the Plan's PFIGO option rests solely on the assertion that the PFIGO offered participants a lower crediting rating compared to a few other fixed income products.  ¶¶ 67-80.  Plaintiffs attempt to compare the PFIGO against the TIAA Traditional Retirement Choice Plus ("RC Plus"), the custom stable value product built by Principal for Norton Healthcare, and aggregated data from unidentified "Peer Plans."  ¶¶ 67-80.  But, just as with recordkeeping agreements and mutual funds, Plaintiffs cannot support challenges to the PFIGO without providing, not just comparators, but *meaningful* comparators; these purported comparators do not satisfy Plaintiffs' burden.  *Singh*, 650 F. Supp. 3d at 268; *Boyette*, 2023 U.S. Dist. LEXIS 203442, at *3, 20.

To start, the FAC does not allege any facts to show that these purportedly superior products—either those specifically named or those in the enigmatic "Peer Plans Average"— were available to the Plan during the putative class period.  Indeed, though Plaintiffs themselves acknowledge that "the product is structured as an insurance contract," they do not reference or attach the contracts for any of the purported comparator products or allege facts to show that the Plan would have qualified to adopt them.  ¶ 68.  Without this information, it is impossible to discern whether the purported alternative investments were actually investable alternatives for the Plan, particularly in the case of the product custom-built for Norton Healthcare and the unnamed products held by the enigmatic "peer plans," which Plaintiffs have not shown to be comparable to the Plan in size or structure.  *Supra* § II.A.3.

Additionally, though Plaintiffs themselves acknowledge the variance among stable value products, alleging that a fiduciary "must understand the contract terms relevant to its investment

experience, including asset ownership and credit risk; minimum and maximum rates; asset charges and other fees; declaration of crediting rates; equity wash, surrender charges, and other participant-level liquidity restrictions; termination, withdrawal restrictions, and other plan-level liquidity restrictions," the FAC contains no comparisons of the contracts for the PFIGO or the alleged alternative products.  ¶68.  Instead, Plaintiffs focus solely on returns, which cannot be used as the sole basis of a comparison to create an inference of imprudence.  *Supra* §§ I.A & II.A.1-2.

Indeed, one of the comparator funds' own websites warns that terms and conditions for the TIAA Traditional Retirement Choice Plus fund vary according to individualized contracts, showing that even identically titled products may vary from plan-to-plan, highlighting the folly of merely presuming one product is comparable to another.  *Understanding TIAA Traditional liquidity,*  https://www.tiaa.org/public/retire/financial-products/annuities/retirement-plan-annuities/tiaa-traditional-annuity/contract-rules (last visited Oct. 23, 2024).  Yet Plaintiffs make exactly this error, presuming and asserting that the purported comparators were comparable and available to the Plan during the putative class period.

Such comparisons are not meaningful benchmarks.  *Sandoval v. Exela Enter. Sols.*, No. 3:17cv1573 (DJS), 2020 U.S. Dist. LEXIS 253226, at *18-20 (D. Conn. Mar. 30, 2020); *Meiners*, 898 F.3d at 823.  Plaintiffs' conclusory assertions of comparability are simply that, and they cannot support an inference of imprudence.  *Iqbal*, 556 U.S. at 679.

## CONCLUSION

For the reasons stated herein, this Court should dismiss the FAC with prejudice.[13]

Dated: February 10, 2025

---

[13] Through the pre-motion conference process, Plaintiffs had the chance to amend their complaint to put their best case forward.  Indeed, the Court indicated at the pre-motion conference that additional opportunities to amend would not be afforded.

Respectfully submitted,

**JACKSON LEWIS P.C.**

*/s/ Caterina Catalano*
Joseph Anthony Saccomano, Jr
Joseph.Saccomano@jacksonlewis.com
Caterina Catalano
Caterina.Catalano@jacksonlewis.com
44 South Broadway, 14th Floor
White Plains, NY 10601
Telephone:    (914) 872-8060

Howard Shapiro*
Howard.Shapiro@jacksonlewis.com
Lindsey H. Chopin*
Lindsey.Chopin@jacksonlewis.com
Alex E. Hotard*
Alex.Hotard@jacksonlewis.com
601 Poydras Street, Suite 1400
New Orleans, Louisiana 70130
Telephone:    (504) 208-1755

*admitted *pro hac vice*

## CERTIFICATE OF SERVICE

On this day February 10, 2025, the undersigned caused the foregoing document to be served upon counsel of record for Plaintiffs via electronic email.

*/s/ Caterina Catalano*
Caterina Catalano

26